UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO.: _____

|  |  |  |
|---|---|---|
| VALERIE MOBLEY, as Administrator of the Estate of RENNY DE'ANGELO MOBLEY | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| GARRY MCFADDEN in his Official Capacity; MECKLENBURG COUNTY; TELISA WHITE in her Individual Capacity; STEVEN BUCHANAN in his Individual Capacity; JOHN PAYNE in his Individual Capacity; LARRY HOUPE in his Individual Capacity; BENTRELL BLOCKER in his Individual Capacity; QUADERAH CAVER in her Individual Capacity; MICHELLE LANGFORD in her Individual Capacity; LOURDES MARTINEZ in her Individual Capacity; ROBERT NEECE in his Individual Capacity; JAMIE JAQUEZ in his individual capacity; KERRI-ANN LEWIS in her Individual Capacity; TIMIKA MASSEY in her Individual Capacity; MARCUS CHEA in his Individual Capacity; SABRINA GARRIS in her Individual Capacity; RESERVE HEALTH, PC; DANIEL BIONDI in his Official and Individual Capacity; LEKE ATABONG in her Individual Capacity; JOSEPHINE BASHAKA in her Individual Capacity; TADASHIA BRICE in her Individual Capacity; CHRISTI EDEN in her Individual Capacity; SHAVONNE ELLIS in her Individual Capacity; SHADALA FAIR in her Individual Capacity; VALERIE GILBERT in her Individual Capacity; MARY LE-BLISS in her Individual Capacity; GILDA LOUALLEN in her Individual Capacity; CIERRIA MERCADO in her Individual Capacity; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** |

BRITTANY MOORE in her Individual )
Capacity; JUDITH MORTEL in her )
Individual Capacity; TIANA MOTLEY in her )
Individual Capacity; ZACHARIAH )
NOLTEMEYER in his Individual Capacity; )
SALOMON SANCHEZ in his Individual )
Capacity; TIARRA SLADE in her Individual )
Capacity; SHANTA SMITH in her Individual )
Capacity; EVA SQUIBB in her Individual )
Capacity; AALIYYAH TERRY GREEN in her )
Individual Capacity; ANNE THOMPSON in )
her Individual Capacity; DOLLIE WASSON )
in her Individual Capacity; FNU WILLIAMS )
in his/her  Individual Capacity; DEWAYNE )
WILLIAMSON in his Individual Capacity; )
DOE 1 in his/her Individual Capacity; DOE 2 )
in his/her Individual Capacity; DOE 3 in )
his/her Individual Capacity; DOE 4 in his/her )
Individual Capacity; DOE 5 in his/her )
Individual Capacity; DOE 6 in his/her )
Individual Capacity; DOE 7 in his/her )
Individual Capacity; DOE 8 in his/her )
Individual Capacity; and OHIO CASUALTY )
INSURANCE COMPANY )

     Defendants.

---

NOW COMES Plaintiff, Valerie Mobley, as the Administrator of the Estate of Renny De'angelo Mobley, by and through counsel, complaining of Defendants jointly and severally, hereby alleges and says:

## **INTRODUCTION**

1. On February 18, 2023, Renny Mobley was taken into custody and detained at the Mecklenburg County Detention Center Central (MCDCC).

2. Despite Mr. Mobley confirming his dual diagnoses of schizoaffective disorder and substance abuse and addiction disorder and despite obtaining medical confirmation of the same, Defendants failed to ever have Mr. Mobley evaluated or treated by the MCDCC psychiatrist at any time between his admission on February 18, 2023 and his death on death on March 27, 2024.

3. Despite awareness of Mr. Mobley's dual diagnoses, at no time during his detention between February 2023 and his death in March of 2024 did any member of MCDCC detention or medical staff ever bridge Mr. Mobley's care by providing him the correct medication to treat his mental health diagnoses.

4. In response to Mr. Mobley's clinical presentation of schizoaffective relapse, MCDCC detention and medical staff repeatedly failed to medically intervene but instead, repeatedly segregated him or locked him in solitary confinement.

5. Throughout his detention at MCDCC, detention and medical staff failed to properly respond to and treat Mr. Mobley's mental health diagnoses which led him to self-medicate. Over a period spanning approximately 8 hours from March 26th through March 27th, with no intervention from MCDCC medical or detention staff,

Mr. Mobley languished, suffering from drug toxicity while showing all of the clinical symptoms of active drug overdose.

6. During that span of time, on March 26, 2024 and into the morning of March 27, 2024, while under the supervision of Detention Officer Jaquez, Sergeant Blocker and Captain Houpe, Mr. Mobley was experiencing an obvious medical emergency.

7. At 4:53 a.m. on Monday, March 27, 2024, fellow MCDCC residents found Mr. Mobley appearing catatonic and unresponsive in his cell.

8. After repeated pleas by residents for Detention Officer Jaquez to call for medical help, Jaquez issued an alert requesting emergency medical assistance.

9. Despite being trained and certified in CPR and First Aid, at no time while Mr. Mobley was in active medical distress, did Officer Jaquez ever render aid to Mr. Mobley.

10. Mr. Mobley never regained consciousness and upon arrival at Atrium Main Emergency Department, he remained unresponsive, was pulseless with nonreactive pupils, had a Glascow Coma Score of 1 and a presentation description of "toxic-appearing".

11. He was intubated and artificial ventilation was initiated but the damage to Mr. Mobley's brain was severe and irreversible. Artificial ventilation was withdrawn and Mr. Mobley was pronounced dead at Atrium Health Hospital at 3:18 pm on March 27, 2024.

12.     Plaintiff as Administrator of the Estate of Renny DeAngelo Mobley brings this civil action pursuant to 42 U.S.C. 1983, against (a) the individual Defendants for deliberate indifference to the serious medical and mental health needs of Mr. Mobley in violation of his substantive due process rights under the Fourteenth Amendment, and (b) Defendants Mecklenburg County, Sheriff McFadden, Dr. Biondi and Reserve Health, P.C. for their respective policies and /or customs of deliberate indifference to the serious medical and mental health needs of residents, like Renny Mobley, with serious mental illness and emergency medical needs.

13.     Plaintiff also brings claims under North Carolina law, including: (a) an official bond action, under N.C. Gen. Stat. § 58-76-5 against Sheriff McFadden and Ohio Casualty Insurance Company, (b) medical malpractice claims against Defendants Reserve Health, P.C. and the Medical Defendants, and (c) a corporate negligence and gross negligence action against Reserve Health, P.C.

14.     Plaintiff seeks to recover compensatory damages from Defendants for Mr. Mobley's personal injuries and wrongful death. Plaintiff also seeks to recover punitive damages from the individual Defendants and Reserve Health, P.C. under federal law, and punitive damages from Defendants Reserve Health, and the Medical Defendants under state law.

## JURISDICTION AND VENUE

15.     Plaintiff as Administrator of the Estate of Renny DeAngelo Mobley brings this civil action pursuant to 42 U.S.C. 1983 for acts committed by Defendants under color of state law which deprived Mr. Mobley of his due process rights as a

pretrial detainee to be free from deliberate indifference to his serious medical needs under the Fourteenth Amendment to the United States Constitution.

16.     Plaintiff's actions arise under the United States Constitution and the laws of the United States.

17.     The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 (*federal question*), 1343(a)(3) and 1343(a)(4) (*civil rights*).

18.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) because the alleged violations of federal law are substantial, and the pendent causes of action derive from a common nucleus of operative facts.

19.     Under 28 U.S.C. §1391(b), venue is proper in the United States District Court for the Western District of North Carolina because all of the events giving rise to this action occurred in the Western District.

20.     This is a wrongful death action under N.C. Gen. Stat. § 28A-18-2 to recover damages for Mr. Mobley's wrongful death.

21.     This is also a survival action under N.C. Gen. Stat. § 28A-18-2 to recover damages for Mr. Mobley's personal injuries.

## PARTIES

### A.     PLAINTIFF

22.     Plaintiff, Valerie Mobley, is the lawfully designated Administrator of the Estate of her deceased son, Renny De'angelo Mobley, (Mecklenburg County File No.

24E-002272-590) and is a citizen and resident of Mecklenburg County, North Carolina.

23. Renny De'angelo Mobley ("Mr. Mobley"), was born in 1981. He was 42 years old at the time of his death on March 27, 2024 in Mecklenburg County, North Carolina.

24. Mr. Mobley was a pre-trial detainee and resident in the care and custody of the Mecklenburg County Sheriff at Mecklenburg County Detention Center Central at the time he stopped breathing and lost consciousness.

25. Mr. Mobley's sole heir at law is his daughter Jada Aunea Mobley, age 26. Mr. Mobley was not married at the time of his death.

**B. MECKLENBURG COUNTY**

26. Defendant Mecklenburg County is a county in North Carolina organized and existing under N.C. Gen. Stat. § 153A-10, and it has all the corporate powers set forth in N.C. Gen. Stat. § 153A-11, including the power to be sued.

27. Mecklenburg County is a "unit" and "local government" under N.C. Gen. Stat. § 153A-216, *et seq*. It has the powers to establish, acquire, erect, repair, maintain, and operate a local confinement facility, also known as a detention facility or jail.

28. Mecklenburg County maintains and operates Mecklenburg County Detention Center Central (MCDCC) located at 801 E. 4th Street, Charlotte, North Carolina. MCDCC is designed to house over 1900 residents.

29.     Mecklenburg County is responsible, under N.C. Gen. Stat. § 153A-225, for developing an adequate medical plan to provide medical care to residents at MCDCC, including the medical supervision of residents and emergency medical care for residents to the extent necessary for their health and welfare.

30.     At all times relevant to this action, Mecklenburg County had final policymaking authority over the provision of medical care and emergency medical care to residents at MCDCC.

31.     Upon information and belief, at all relevant times, Mecklenburg County and/or Sheriff McFadden contracted with Wellpath, LLC[1] to deliver medical and mental healthcare to MCDCC residents on behalf of Mecklenburg County and Sheriff McFadden.

32.     Mecklenburg County is sued under 42 U.S.C. § 1983 for an official policy or custom of deliberate indifference to the serious medical needs of residents like Mr. Mobley, who suffer from serious mental health disorders and severe drug intoxication at MCDCC.

33.     Upon information and belief, by obtaining liability insurance and/or participation in a governmental risk pool, or by contractually requiring its agents to purchase liability insurance and name Mecklenburg County as an additional insured, the County, on its own behalf as well as on its agents, has waived governmental immunity.

_____

[1] Wellpath has filed for bankruptcy and is not a named defendant in this complaint.

**C.    DEFENDANT MCFADDEN, OHIO CASUALTY and DETENTION DEFENDANTS**

34.    Upon information and belief, Defendant Garry L. McFadden ("Sheriff McFadden") is a citizen and resident of Mecklenburg County and, at all relevant times, was and is the current Mecklenburg County Sheriff and as such, he was and is the chief law enforcement officer for Mecklenburg County. Sheriff McFadden is sued in his official capacity.

35.    Defendant Sheriff McFadden is and was at all times relevant to this action:

   a.  in control of MCDCC;

   b.  the final decision-making authority over law enforcement policies and MCDCC staff;

   c.  directly responsible for the appointment, retention, supervision and conduct of his officers, medical staff, deputies, employees and agents;

   d.  responsible for the care and control of the MCDCC;

   e.  responsible for the care and custody of residents detained or held in the MCDCC;

   f.  acting in the course and scope of his official duties as Sheriff of Mecklenburg County and under color of state law;

   g.  along with his agents, the keeper of the MCDCC, pursuant to N.C.G.S. § 162-55; and

   h.  is vicariously liable for the actions and inactions of his agents, employees, including, but not limited to, justice officers, managers, supervisors, medical staff, detention officers, and/or deputies.

36.    Upon information and belief, Sheriff McFadden or the Mecklenburg County Sheriff's Office or Mecklenburg County, on the sheriff's behalf, purchased

liability insurance, and/or contractually required its agents to purchase liability insurance and name Sheriff McFadden or the Mecklenburg County Sheriff's Office ("MCSO") as an additional insured, and/or invested/paid to participate in a local government risk pool that provides coverage for claims made by Plaintiff and will indemnify the Defendants, if found liable in this matter, thereby waiving any governmental immunity that might otherwise apply to the Sheriff or his agents in this action.

37.    At all times relevant to this action, Defendant Ohio Casualty Insurance Company ("Ohio Casualty") was and is a surety company and serves as the surety bond holder, under bond # 32S616571, for Sheriff McFadden, pursuant to N.C.G.S. § 58-76-5 and N.C.G.S. § 162-8.

38.    Upon information and belief, Ohio Casualty, as the surety bond holder for Sheriff McFadden, is liable for the acts of Sheriff McFadden and his agents under virtue or color of office resulting in serious harm pursuant to N.C.G.S. § 58-76-5.

39.    Upon information and belief, Sheriff McFadden, on behalf of himself and his agents, waived applicable immunity by obtaining a surety bond and/or by purchasing liability insurance and/or participating in a governmental risk pool.

40.    Upon information and belief, Defendant Detention Officer Marcus Chea ("D.O. Chea"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

41.     Upon information and belief, Defendant Detention Officer Sabrina Garris ("D.O. Garris"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

42.     Upon information and belief, Defendant Detention Officer Jaime Jaquez ("D.O. Jaquez"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

43.     Upon information and belief, Defendant Detention Officer Kerri-Ann Lewis ("D.O. Lewis"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

44.     Upon information and belief, Defendant Detention Officer Timika Massey ("D.O. Massey"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

45.     Upon information and belief, Defendant Sergeant Bentrell Blocker ("Sgt. Blocker"), named in his individual capacity, is a citizen and resident of

Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff. Sgt. Blocker was the 3rd Floor Sergeant on March 27, 2024.

46.     Upon information and belief, Defendant Sergeant Quaderah Caver ("Sgt. Caver"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff.

47.     Upon information and belief, Defendant Sergeant Michelle Langford ("Sgt. Langford"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff.

48.     Upon information and belief, Defendant Sergeant Lourdes F. Martinez ("Sgt. Martinez"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff.

49.     Upon information and belief, Defendant Sergeant Robert Neece ("Sgt. Neece"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and

assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff.

50.    Upon information and belief, Defendant Captain Steven M. Buchanan ("Capt. Buchanan"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff.

51.    Upon information and belief, Defendant Captain John. R. Payne ("Capt. Payne"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff.

52.    Upon information and belief, Defendant Captain Larry Houpe ("Capt. Houpe"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff. Capt. Houpe was assigned the duties of Shift Commander on March 27, 2024.

53.    Upon information and belief, Defendant Chief Telisa White ("Chief White"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and was Chief of Detention of MCDCC assigned to oversee resident

custodial care duties within the MCDCC, including training and supervising detention staff.

54. Defendants D.O. Chea, D.O. Garris, D.O. Jaquez, D.O. Lewis, D.O. Massey, Sgt. Blocker, Sgt. Caver, Sgt. Langford, Sgt. Martinez, Sgt. Neece, Capt. Buchanan, Capt. Payne, Capt. Houpe and Chief White are collectively referred to as the "Detention Defendants."

55. To the extent that any of the above-named Defendants is considered a public officer, his or her gross negligence dictates that public officer immunity would not apply.

### D. DEFENDANTS RESERVE HEALTH, DR. BIONDI AND MEDICAL DEFENDANTS

56. Upon information and belief, Defendant Reserve Health, P.C. ("Reserve Health") contracted with Wellpath and/or Sheriff McFadden and/or Mecklenburg County to provide the services of Medical Director, medical physician services, medical nurse practitioner services, medical physician assistant services, psychiatric physician services and medication prescribing services for MCDCC residents.

57. Defendant Reserve Health is a North Carolina corporation, licensed and doing business in Mecklenburg County, North Carolina.

58. Defendant Reserve Health is sued for its own tortious wrongdoing, as well as under the theory of respondeat superior for the acts and failures to act by its employees responsible for providing medical and mental healthcare services for MCDCC residents, including Mr. Mobley.

59.     Upon information and belief, Defendant Daniel T. Biondi ("Dr. Biondi") is a resident of Mecklenburg County, North Carolina, and was, at all relevant times, a physician practicing as a physician with Reserve Health and employed by or contracted by Mecklenburg County and/or Sheriff McFadden to provide healthcare services to MCDCC residents. Dr. Biondi is named in his individual capacity and his official capacity as MCDCC Medical Director and owner of Reserve Health.

60.     At all relevant times herein, Dr. Biondi was the Medical Director and Chief Physician of MCDCC and was charged with the supervision and oversight of the medical staff at MCDCC, including, but not limited to, the following personnel:

> Leke Atabong, NP
> Josephine Bashaka, MA
> Tadashia Brice, MA
> Christi Eden, MA
> Shavonne Ellis, MA
> Shadala Fair, RN
> Valerie Gilbert, LPN
> Mary Le-Bliss, MD
> Gilda Louallen, MA
> Cierra Mercado, LCSW
> Brittany Moore, LPN
> Judith Mortel, LPN
> Tiana Motley, LPN
> Zachariah Noltemeyer, NP
> Salomon Sanchez, PA
> Tiarra Slade, LPN
> Shanta Smith, MA
> Eva Squibb, NP
> Aaliyyah Terry Green, MA
> Anne Thompson, RN
> Dollie Wasson, LPN
> FNU Williams, RN
> Dwayne Williamson, LPN
> Doe 1-8

61.     Upon information and belief, Defendant Leke Atabong ("Atabong") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Nurse Practitioner (NP) to provide medical care, including medication services to MCDCC residents. Atabong is named in her individual capacity.

62.     Upon information and belief, Defendant Josephine Bashaka ("Bashaka") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Medical Assistant (MA) to provide medical care, including medication administration, to MCDCC residents. Bakasha is named in her individual capacity.

63.     Upon information and belief, Defendant Tadashia Brice ("Brice") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Medical Assistant (MA) to provide medical care, including medication administration, to MCDCC residents. Brice is named in her individual capacity.

64.     Upon information and belief, Defendant Christi Eden ("Eden") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Medical Assistant (MA) to provide medical care, including medication administration, to MCDCC residents. Eden is named in her individual capacity.

65.     Upon information and belief, Defendant Shavonne Ellis ("Ellis") is a resident of Mecklenburg County and was, at all relevant times, employed or

contracted by Wellpath as a Medical Assistant (MA) to provide medical care, including medication administration to MCDCC residents. Ellis is named in her individual capacity.

66.    Upon information and belief, Defendant Shadala Fair ("Fair") is a resident of Mecklenburg County and was, at all material relevant times, employed or contracted by Wellpath as a Registered Nurse (RN) to provide medical care, including medication services, to MCDCC residents. Fair is named in her individual capacity.

67.    Upon information and belief, Defendant Valerie Gilbert ("Gilbert") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse (LPN) to provide medical care, including medication services, to MCDCC residents. Gilbert is named in her individual capacity.

68.    Upon information and belief, Defendant Mary Le-Bliss ("Le-Bliss") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Reserve Health or Wellpath as a Physician (MD) to provide medical care and services, including medication prescribing services to MCDCC residents. Le-Bliss is named in her individual capacity.

69.    Upon information and belief, Defendant Gilda Louallen ("Louallen") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Medical Assistant (MA) to provide medical care, including medication administration to MCDCC residents. Louallen is named in her individual capacity.

70.     Upon information and belief, Defendant Cierria Mercado ("Mercado") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath or Reserve Health as a Licensed Clinical Social Worker Associate (LCSWA) to provide mental health care to MCDCC residents. Mercado is named in her individual capacity.

71.     Upon information and belief, Defendant Brittany Moore, ("Moore") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse (LPN) to provide medical care, including medication services, to MCDCC residents. Moore is named in her individual capacity.

72.     Upon information and belief, Defendant Judith Mortel ("Mortel") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse (LPN) to provide medical care, including medication services, to MCDCC residents. Mortel is named in her individual capacity.

73.     Upon information and belief, Defendant Tiana Motley ("Motley") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse (LPN) to provide medical care, including medication services to MCDCC residents. Motley is named in her individual capacity.

74.     Upon information and belief, Defendant Zachariah Noltemeyer ("Noltemeyer") is a resident of Mecklenburg County and was, at all relevant times,

employed or contracted by Reserve Health or Wellpath as a Licensed Family Nurse Practitioner (FNP) to provide medical care, including medication administration and prescribing services, to MCDCC residents. Noltemeyer is named in his individual capacity.

75.    Upon information and belief, Defendant Salomon Sanchez ("Sanchez") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Reserve Health as a Licensed Physician Assistant (PA) to provide medical care, including medication administration and prescribing services, to MCDCC residents. Sanchez is named in his individual capacity.

76.    Upon information and belief, Defendant Tiarra Slade ("Slade") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse (LPN) to provide medical care, including medication services, to MCDCC residents. Slade is named in her individual capacity.

77.    Upon information and belief, Defendant Shanta Smith ("Smith") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Medical Assistant (MA) to provide medical care, including medication administration to MCDCC residents. Smith is named in her individual capacity.

78.    Upon information and belief, Defendant Eva Squibb, ("Squibb") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted as by Reserve Health or Wellpath a Licensed Family Nurse Practitioner

(FNP) to provide medical care, including medication administration and prescribing services, to MCDCC residents. Squibb is named in her individual capacity.

79. Upon information and belief, Defendant Aaliyyah Terry Green ("Green") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse (LPN) to provide medical care, including medication services, to MCDCC residents. Green is named in her individual capacity.

80. Upon information and belief, Defendant Anne Thompson, ("Thompson") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Registered Nurse (RN) to provide medical care, including medication services, to MCDCC residents. Thompson is named in her individual capacity.

81. Upon information and belief, Defendant Dollie Wasson ("Wasson") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse (LPN) to provide medical care, including medication services, to MCDCC residents. Wasson is named in her individual capacity.

82. Upon information and belief, Defendant FNU Williams, ("Williams") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Registered Nurse (RN) to provide medical care, including medication services, to MCDCC residents. Thompson is named in his/her individual capacity.

83. Upon information and belief, Defendant Dewayne Williamson ("Williamson") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as Licensed Practical Nurse (LPN) to provide medical care, including medication services, to MCDCC residents. Williamson is named in his individual capacity.

84. Upon information and belief, Defendant Doe 1 ("Doe 1") is a resident of Mecklenburg County and was, at all relevant times employed or contracted by Wellpath and/or Reserve Health as a Licensed Mental Health Clinician to provide mental health care to MCDCC residents. Doe 1 is named in his/her individual capacity.

85. Upon information and belief, Defendant Doe 2 ("Doe 2") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath and/or Reserve Health as a Licensed Mental Health Clinician to provide mental health care to MCDCC residents. Doe 2 is named in his/her individual capacity.

86. Upon information and belief, Defendant Doe 3 ("Doe 3") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath and/or Reserve Health as a Licensed Mental Health Clinician to provide mental health care to MCDCC residents. Doe 3 is named in his/her individual capacity.

87. Upon information and belief, Defendant Doe 4 ("Doe 4") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by

Wellpath and/or Reserve Health as a Licensed Mental Health Clinician to provide mental health care to MCDCC residents Doe 4 is named in his/her individual capacity.

88.     Upon information and belief, Defendant Doe 5 ("Doe 5") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath and/or Reserve Health as a Licensed Mental Health Clinician to provide mental health care to MCDCC residents. Doe 5 is named in his/her individual capacity.

89.     Upon information and belief, Defendant Doe 6 ("Doe 6") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath and/or Reserve Health as a Licensed Mental Health Clinician to provide mental health care to residents at the MCDCC. Doe 6 is named in his/her individual capacity.

90.     Upon information and belief, Defendant Doe 7 ("Doe 7") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath and/or Reserve Health as a Licensed Mental Health Clinician to provide mental health care to MCDCC residents. Doe 7 is named in his/her individual capacity.

91.     Upon information and belief, Defendant Doe 8 ("Doe 8") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath and/or Reserve Health as a Licensed Mental Health Clinician to provide

mental health care to MCDCC residents. Doe 8 is named in his/her individual capacity.

92.     Defendants Atabong, Bashaka, Brice, Eden, Ellis, Fair, Gilbert, Le-Bliss, Louallen, Mercado, Moore, Mortel, Motley, Noltemeyer, Sanchez, Slade, Smith, Squibb, Green, Thompson, Wasson, Williams and Williamson, and Defendants Doe 1 through Doe 8 are collectively referred to herein as the "Medical Defendants."[2]

93.     At all relevant times to this action the Medical Defendants were acting under the color of state law at the MCDCC.

94.     The Medical Defendants and Reserve Health were responsible for providing Mr. Mobley with medical and mental health care while at MCDCC.

95.     The Medical Defendants were acting within the course and scope of their employment during their interactions with Mr. Mobley, as alleged herein.

96.     At all relevant times to this action the Medical Defendants and Dr. Biondi were health care providers as defined in N.C. Gen. Stat. § 90-21.11.

97.     In addition to Plaintiff's civil rights claims, Plaintiff sets forth claims of medical malpractice under North Carolina law, alleging the Medical Defendants failed to comply with the applicable standard of care under N.C. Gen. Stat. § 90-21.12(a) in their care and treatment of Mr. Mobley.

98.     The medical care provided to Mr. Mobley by the Medical Defendants, and all the medical records pertaining to the alleged negligence and gross negligence that are available to Plaintiff after reasonable inquiry, have been reviewed by a

_____

[2] Wellpath's bankruptcy order does not bar claims against the individuals employed by Wellpath, LLC.

board-certified psychiatrist, a doctor of pharmacy, board-certified in psychiatric pharmacy, a licensed nurse practitioner and a licensed physician specializing in correctional health who are each reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and are each willing to testify that the medical care provided by the Medical Defendants did not comply with the applicable standard of care for such health care providers.

99.    Upon information and belief, Dr. Biondi did not form a doctor-patient relationship with Renny Mobley between February 18, 2023, and March 27, 2024. Thus, Plaintiff's claims against Dr. Biondi do not constitute a medical malpractice claim, pursuant to statute.

## FACTUAL ALLEGATIONS

100. Plaintiff incorporates the paragraphs above as if fully set forth herein.

### A.    BACKGROUND INFORMATION

101.   The Mecklenburg County Detention Center Central (MCDCC) was constructed in 1997 and all operations officially moved into the facility in 1997. It consists of several administration offices, a public lobby and processing, booking, and releasing areas, a medical station, and five resident housing blocks referred to as pods.

102.   At all times herein, a person held at the MCDCC is referred to as a "resident" or collectively as "residents."

103.   By operation of North Carolina statute, the elected Sheriff, through his employees and agents, is exclusively responsible for operations of the MCDCC,

including all care and supervision of residents, full oversight of resident healthcare, and full compliance with State and Federal law, the North Carolina Administrative Code and all MCDCC policies, methods, and procedures to ensure security, safety and health of all MCDCC residents, as well as the security and safety of employees and agents assigned to the MCDCC.

104.     Mecklenburg County is vested with policymaking authority over the provision of medical care to residents and the obligation to fund such care.

105.     Upon information and belief, Wellpath served as Sheriff McFadden's agent to employ and provide medical staff at the MCDCC, as proscribed under Wellpath's contract with Mecklenburg County and/or Sheriff McFadden, to provide healthcare services, including medical and mental healthcare, to MCDCC residents.

106.     Pursuant to its contract with Wellpath, and/or Mecklenburg County and/or Sheriff McFadden, Reserve Health and its agent, Dr. Biondi provided supervision of all professional medical, mental health, dental and related healthcare services for MCDCC residents, including sick calls, nursing care, physician care, medical sub-specialty services, mental healthcare, and other healthcare services based on the healthcare needs of the MCDCC residents.

107.     Upon information and belief, Dr. Biondi and Medical Defendants were, at all relevant times, responsible for executing the medical plan established by Mecklenburg County, Defendant McFadden, Wellpath, Reserve Health and Dr. Biondi, to provide healthcare to MCDCC residents.

108. Upon information and belief, Sheriff McFadden and the Detention Defendants were, at all relevant times, responsible for implementation of and compliance with Sheriff McFadden's policies and procedures for MCDCC, and with the exception of D.O. Chea, D.O. Garris, D.O. Jaquez, D.O. Lewis, and D.O. Massey, the Detention Defendants were responsible for the training, supervision, and oversight of Sheriff McFadden's detention employees assigned to work at the MCDCC.

109. In accordance with 10A North Carolina Administrative Code 14J ("10A NCAC 14J"), the operations of the MCDCC are governed by the following industry standards:

    a. Appalachian State University, Model Policies and Procedures Manual for North Carolina Jails;

    b. American Correctional Association, Standards for Adult Local Detention Facilities;

    c. American Correctional Association, Standards for Small Jails;

    d. National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails; and

    e. United States Marshal Service Policy Directives for the provision and management of healthcare services to prisoners in the custody of the United States Marshals Service.

110. Under the United States Constitution and the North Carolina State Constitution Mecklenburg County and Sheriff McFadden have a non-delegable duty to provide adequate medical care, including mental health screenings and treatment, to MCDCC residents.

111.    Upon information and belief, Mecklenburg County Sheriff's Office ("MCSO") had policies and procedures ("MSCO Policy and Procedure") for MCDCC that were reviewed and approved by the County in consultation with Wellpath, LLC, Reserve Health, Dr. Biondi and Sheriff McFadden

112.    Upon information and belief, the Mecklenburg County Sheriff's Department is accredited by the National Commission on Correctional Healthcare ("NCCHC") and, in addition to the medical standards imposed by the State of North Carolina, has otherwise agreed to maintain compliance with 100% of the essential standards established by NCCHC in the operation of MCDCC.

113.    Defendant McFadden, his employees and agents, including the Detention Defendants and Medical Defendants, Reserve Health and Dr. Biondi, knew, or should have known, that deliberate indifference to the serious medical or mental health needs of a MCDCC resident constitutes unnecessary and wanton infliction of pain, as proscribed by the Eighth and Fourteenth Amendments to the United States Constitution, and the parallel provisions of our state constitution, as well as negligent, grossly negligent, and/or willful and wanton conduct.

114.    On December 4, 2018, Defendant McFadden was sworn into office as the Sheriff of Mecklenburg County.

115.    Upon information and belief, Sheriff McFadden, Wellpath, LLC and Reserve Health devised policies and procedures for pharmaceutical operations, medication services and informed consent and right to refuse for the administration of prescription medication to MCDCC residents.

116.   Upon information and belief, Dr. Biondi, as Medical Director, approved Sheriff McFadden's policies and procedures.

117.   Upon information and belief, Sheriff McFadden's policies and procedures included a daily medication administration schedule whereby prescriptions that were to be administered twice daily were administered to residents by medical staff at two intervals: at or around 10:00 a.m. and at or around 10:00 p.m. each day.

118.   Upon information and belief, Sheriff McFadden's policies and procedures instituted a protocol where, rather than medical staff delivering prescription medications to residents, cell-side, medical staff posted with the medication cart at the pod's command podium and then each pod supervisor issued a call-out to residents to announce the arrival of the medication cart.

119.   Based on the Sheriff's policies and procedures, if the MCDCC resident heard the pod supervisor's call-out announcing arrival of the medication cart the resident would exit the cell, approach the medication cart, and receive their prescription medication.

120.   Upon information and belief, contrary to policies and procedures, Sheriff McFadden and/or Dr. Biondi required medical staff to deliver the morning round of medication to some pods around 4:00 a.m. rather than 10:00 a.m.

121.   Upon information and belief, when the MCDCC pod supervisor announces the 4:00 a.m. arrival of the medication cart, most MCDCC residents are

asleep and therefore unaware that the MCDCC medication cart holding their medications is present within the pod.

122.    Upon information and belief, Sheriff McFadden's policies and procedures require that missed medications be documented and tracked via a form entitled, "Refusal of Medication/Missed Medications" The form captures data including the resident's name, identification number, date of birth, the date and time of the missed dosage, allergies, and gender.

123.    Additionally, the form requires that the name and dosage amount of any missed medication be recorded, along with the reason for the missed dosage, the resident/patient's signature, the signature of the staff noting the missed dosage and the signature of a witness to the missed dosage, if the resident refuses to sign.

124.    While, upon information and belief, Sheriff McFadden's policy and procedures require medical staff delivering medication to notify the prescriber if a resident misses or refuses medications classified as high priority medication, neither Sheriff McFadden nor Dr. Biondi enforce the reporting requirement.

125.    While, upon information and belief, Sheriff McFadden's policies and procedures require medical staff delivering medication to notify the prescriber if a resident misses or refuses four doses of prescription medication within seven days or when a pattern of refusing medication is established, neither Sheriff McFadden nor Dr. Biondi enforce the reporting requirement.

126. Sheriff McFadden and/or Dr. Biondi instituted no additional policies, measures or requirements to ensure missed medications were otherwise provided when residents did not exit their cell and were not provided with their medication.

127. In 2019, Sheriff McFadden, with the support of Mecklenburg County, purchased and installed the most advanced, cutting-edge full-body scanner at MCDCC to increase the detection and exclusion of contraband, such as drugs and weapons, from entering MCDCC, thereby increasing safety and security.

128. Upon information and belief, the full-body scanner purchased by Defendant McFadden utilizes millimeter wave technology and/or X-ray technology capable of intricately capturing bodily images that successfully detect objects hidden on or within the human body.

129. Upon information and belief, despite Defendant McFadden's stated purpose for the newly purchased full-body scanner, to significantly improve safety and security within the MCDCC, Defendant McFadden failed to mandate that he, his deputies, staff, agents or volunteers submit to the full-body scanning system before entering the MCDCC.

130. By the spring of 2024, Defendant McFadden had served as the County's elected sheriff for just over five years and during that period, under his exclusive leadership and authority, there were more than eighteen resident deaths at the MCDCC.

131. This Complaint is the eighth civil complaint filed as a result of yet another tragic, preventable, wrongful death of a MCDCC resident whose care and well-being were entrusted to Defendant McFadden, his employees and agents.

**B.** **RENNY MOBLEY'S SERIOUS MENTAL HEALTH CONDITION**

132. Upon information and belief, Renny Mobley was diagnosed with schizoaffective disorder through clinical diagnosis in 2018, at the age of 37 by Psychiatrist, Dr. Mack Whitehead at CMC (Atrium) Department of Psychiatry.

133. Schizoaffective disorder is a chronic, incurable brain disorder that affects less than one percent of the U.S. population. Like those diagnosed with schizophrenia, those diagnosed with schizoaffective disorder experience common symptoms including delusions, hallucinations, difficulty with thought and concentration, agitation, defiance, hyper-sexuality, lack of motivation, anosognosia and a myriad of other mood- and behavior-related symptoms.

134. Those suffering from schizoaffective disorder additionally experience more significant mood disturbances including periods of depression, mania or mixed episodes of both depression and mania.

135. Anosognosia is a common symptom of schizoaffective disorder involving the lack of insight or awareness about the patient's diagnosis. When a patient with schizoaffective disorder fails to disclose, admit or recall their diagnosis and/or associated treatment for it, the individual is likely experiencing this common symptom. Individuals who experience anosognosia also experience higher rates of relapse into active schizoaffective disorder.

136.     Upon information and belief, Mr. Mobley experienced anosognosia, particularly related to the treatment and management of his schizoaffective disorder.

137.     Those diagnosed with schizoaffective disorder have high medication and treatment nonadherence rates. Between 50 and 62% of those diagnosed with schizoaffective disorder are or have been, medication nonadherent. Self-medication via illicit drug use is a common consequence for those who are unmedicated and suffering anosognosia.

138.     Upon information and belief, tablet-based risperidone given orally was the first treatment prescribed in attempt to manage Mr. Mobley's schizoaffective disorder when he was initially diagnosed, but when he experienced no improvement, his psychiatrist, Dr. Whitehead, prescribed an alternative medication: 156 mg of Invega Sustenna administered through monthly intramuscular injections.

139.     With Invega Sustenna, Mr. Mobley experienced drastic symptom improvement, and Dr. Whitehead confirmed Invega Sustenna's efficacy in the successful management of his schizoaffective disorder.

140.     With continued monitoring of Mr. Mobley's response to Invega Sustenna, Dr. Whitehead determined that despite favorable symptom relief through monthly Invega Sustenna injections, Mr. Mobley also experienced significant, negative side effects from the injections. Based on further monitoring, Dr. Whitehead determined Mr. Mobley's treatment required further modification and switched the delivery from Invega Sustenna injections to Invega tablets. Dr. Whitehead's care, monitoring and oversight confirmed that tablet-based Invega proved successful, and

Mr. Mobley experienced continued symptom relief with a reduction in negative side effects.

141. Upon information and belief, between 2021 and February of 2023, with Dr. Whitehead's continued care, monitoring and oversight, Mr. Mobley's schizoaffective disorder was successfully managed through a daily tablet of 6mg of Invega.

142. Upon information and belief, Mr. Mobley was scheduled for an appointment at CMC Psychiatry with Dr. Whitehead for continued monitoring and care and to receive his monthly prescription of Invega on or around February 21, 2023, just days after his February 18, 2023, arrest.

**C. ARRESTS AND PROCESSING**

143. On May 10, 2022, Mr. Mobley was arrested in Charlotte and processed at the MCDCC.

144. Upon information and belief, Mr. Mobley submitted to the full-body scanning system at the MCDCC which confirmed that he was free from contraband upon entry to the MCDCC.

145. After meeting the terms and conditions of his pretrial release order, Mr. Mobley was released from custody on January 11, 2023. One term of his release was that he participate in satellite based electronic monitoring by the use of an ankle monitor.

146. After his release on January 11, 2023, Mr. Mobley encountered challenges with maintaining sufficient electrical charge on his electronic monitoring device.

147. In the weeks that followed, Mr. Mobley reported several malfunctions with his electronic monitoring device and upon information and belief, CMPD replaced Mr. Mobley's electronic device. Despite the replacement, challenges with proper device function, including maintenance of sufficient electrical charge, persisted.

148. Due to continued issues surrounding ensuring sufficient electrical charge on his electronic monitoring device, Mr. Mobley's pretrial release was revoked, and he was taken into custody on February 18, 2023.

149. Once in law enforcement custody, Mr. Mobley was taken to MCDCC where he submitted to the full-body scanning system.

150. The results of Mr. Mobley's full-body scan confirmed that he was free from any contraband on or within his body, which permitted him to be processed and admitted into custody of Sheriff McFadden at MCDCC.

151. MCDCC tracking records confirm that Mr. Mobley was processed without issue through each of the various intake posts within the MCDCC's Arrest Processing Center and he was eventually moved to the orientation pod.

152. Accumulated medical records at MCDCC for Mr. Mobley, beginning in the late 1990's and through his death, document a variety of his health conditions

and diagnoses, including his long-established diagnoses for schizoaffective disorder and substance abuse and addiction disorder.

153. Upon admission to the MCDCC on February 18, 2023, Mr. Mobley disclosed and Defendant Doe 1 documented Mr. Mobley's schizoaffective disorder diagnosis as well as his hyperthyroidism diagnosis.

154. Defendant Doe 1 documented that Mr. Mobley's medical conditions were being managed through prescription medications issued by his community-based treating physicians.

155. Defendant Doe 1 documented that during his February 18th medical admission assessment, Mr. Mobley's appearance did not indicate any abnormalities such as sweating, tremors, or anxiety.

156. Similarly, during the assessment, Defendant Doe 1 documented that Mr. Mobley was free from compromised or restricted physical movement, that his respiration was normal, and recorded his behavior, speech, and mood were appropriate, clear, and unremarkable, respectively.

157. Defendant Doe 1 also documented Mr. Mobley's substance abuse and addiction history, noting a mental health screening previously completed at MCDCC on December 27, 2019, and further documented Mr. Mobley's most recent mental health hospitalization that occurred in 2020, noting that his mental health hospital admission was due in part to Mr. Mobley suffering from hallucinations.

158. On February 18, 2023, Mr. Mobley signed an MCDCC medical release form which, upon information and belief, was faxed to Atrium Health Endocrinology,

along with a request for Atrium Health Endocrinology to forward Mr. Mobley's endocrinology medical records to MCDCC medical staff.

159. Upon information and belief, despite documenting Mr. Mobley's mental health diagnoses and hospitalizations, Defendant Doe 1 and other MCDCC medical staff failed to request Mr. Mobley's mental health treatment records or his medical records associated with his psychiatric-based hospitalizations.

160. There are no notes, records or information explaining the basis of the decision by Defendant Doe 1 and MCDCC medical staff to limit the scope of its records request, ordering only part, rather than all, of the records that comprise Mr. Mobley's full medical and treatment history.

161. Despite having knowledge of Mr. Mobley's diagnoses of serious medical and mental health conditions, MCDCC detention staff and medical staff documented and categorized the care Mr. Mobley required to manage his mental health diagnoses as "routine" and assigned him to be housed within MCDCC's general population.

**D. DETENTION AND MEDICAL CARE FEBRUARY 18, 2023 - MARCH 12, 2024**

162. On February 19, 2023, the day following Mr. Mobley's admission to MCDCC, Defendant Sanchez, PA issued a prescription for 10mg of methimazole to treat Mr. Mobley's hyperthyroidism.

163. Sanchez failed to issue a prescription for Invega for the treatment of Mr. Mobley's schizoaffective disorder and failed to refer Mr. Mobley to be evaluated and treated by MCDCC's psychiatrist.

164.   On February 19th Defendant Williamson, LPN failed to administer Mr. Mobley's prescribed methimazole dosage.

165.   Defendant Williamson entered the word "refusal" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

166.   On February 23rd, five days following his admission to MCDCC Defendant Doe 2, had a healthcare encounter with Mr. Mobley following a sick call request.

167.   During the encounter, Defendant Doe 2 documented Mr. Mobley's overall mental status as "appropriate" however regarding medication adherence, Doe 2 recorded the letters, "n/a" within the clinical notes indicating that medication adherence was not applicable to the management of Mr. Mobley's mental health diagnoses.

168.   Defendant Doe 2 made no notes or records that reconciled Mr. Mobley's documented, complex mental health diagnoses and treatment regime with the entry that medication adherence was not applicable to Mr. Mobley's treatment and care.

169.   Upon information and belief, Mr. Mobley reported to Defendant Doe 2 the same information he was reporting to his mother, that he was not receiving his "mental health meds" while at MCDCC.

170.   None of the records created by Defendant Doe 2 documenting the February 23, 2023 encounter reflect Mr. Mobley's request for and concern about receiving his medication for his schizoaffective disorder. Additionally, Defendant Doe

2 failed to document making an inquiry into Mr. Mobley's mental health medication, to issue a prescription for 6 mg of Invega or report to a provider that the prescription had not been issued for the treatment of Mr. Mobley's schizoaffective disorder.

171.    Defendant Doe 2 documented in the February 23rd encounter record that "Patient states that he is fine and just wants some puzzles." However, Defendant Doe 2 failed to document the disparity between Mr. Mobley's original request to be seen for a sick call and his request for puzzles and the clinical significance thereof. Additionally, Doe 2 failed to record that he/she made any effort to ask Mr. Mobley about the disparity between his original request and his request made during the encounter.

172.    By the end of February 2023, at least four different medical staff had provided some level of medical and/or mental health care to Mr. Mobley. But neither during nor after any encounter, did any of the four take any steps to ensure he received his missed mental health medication and none of the four took any steps to have Mr. Mobley evaluated and treated by a psychiatrist.

173.    Between his initial admission to MCDCC through mid-March of 2023, Mr. Mobley continued to report to his mother, Mrs. Valerie Mobley, that he was still not receiving his "mental health meds."

174.    Throughout that period, Mrs. Mobley repeatedly called MCDCC staff to report her son's diagnoses and explain his medication regimen, reporting that her son was not receiving his Invega prescription for management of his schizoaffective disorder.

175. When Mrs. Mobley requested permission from MCDCC staff to deliver her son's Invega prescription to the MCDCC, she was told that she was prohibited from delivering outside prescription medication to the MCDCC and that MCDCC staff was prohibited from accepting outside medications from the community.

176. On March 9, 2023, MCDCC pod supervisor, Defendant D.O. Massey observed and documented Mr. Mobley's symptoms and presentation. Specifically, Defendant Massey documented that Mr. Mobley was presenting with notable defiance and hyper-sexuality and that natural inhibitions were absent from Mr. Mobley's behavior.

177. Defendant Capt. Buchanan, too, witnessed what Massey had observed.

178. Despite the presentation of Mr. Mobley's symptoms of active schizophrenic relapse, and the clinical significance of the changes in his presentation, no steps were taken by D.O. Massey, Capt. Buchanan, or any other member of MCDCC medical or detention staff to have Mr. Mobley evaluated and treated by a psychiatrist.

179. Not only did Defendants Buchanan and Massey fail to seek psychiatric evaluation or intervention in response to Mr. Mobley symptoms, but instead they locked Mr. Mobley alone in a cell for over eleven hours.

180. Defendant Sgt. Martinez, Massey's supervisor, reviewed Massey's March 9th documentation concerning Mr. Mobley's symptoms. Despite Massey's documentation confirming that Mr. Mobley was exhibiting symptoms of acute mania and recurrence of historical psychotic symptoms consistent with his well-established

diagnosis of schizoaffective disorder, Sgt. Martinez took no steps to have Mr. Mobley evaluated and treated by a psychiatrist or administered Invega. Instead, he approved of Massey's response to lock Mr. Mobley into a cell and failed to take steps to ensure he received his medication.

181. By March 17th, Mr. Mobley had missed thirty continuous doses of Invega, and his symptoms continued, yet no steps were taken by any MCDCC detention staff or medical staff to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medications.

182. Valerie Mobley continued to call, report, and beg MCDCC staff to provide her son with his Invega medication, but to no avail.

183. On March 17, 2023, and again on June 14, 2023, Defendant Squibb, NP renewed Mr. Mobley's 10 mg. methimazole prescription. The prescription issued by Squibb contained the same dosing instructions from the February prescription, however the prescription issued on March 17th, and June 14th was for a dosing period of 90, rather than 30 days. Squibb failed to inquire about Mr. Mobley's mental health diagnoses, to issue Mr. Mobley a prescription for Invega, to take any steps to address his symptoms or missed medications and failed to have him evaluated and treated by MCDCC's psychiatrist.

184. By March 18th, MCDCC medical staff received a copy of Mr. Mobley's medical records from Atrium Health's Endocrinology Department. The records confirmed, among other diagnoses, Mr. Mobley's dual diagnosis of schizoaffective disorder and substance abuse and addiction disorder. The records further detailed

the treatment regimen managing his schizoaffective disorder via monthly intramuscular injection of 156 mg of Invega Sustenna, later modified to a daily single 6 mg oral tablet dose of Invega.

185. Despite the clear entries in Mr. Mobley's medical records for the treatment and management of his schizoaffective disorder diagnosis, no steps were taken by MCDCC medical staff to have Mr. Mobley evaluated and treated by a psychiatrist, to have him receive Invega medication or to otherwise ensure that Mr. Mobley's medical and mental health treatment was properly bridged as required under the accepted standard of care.

186. On March 26, 2023, Defendant Motley, LPN failed to administer Mr. Mobley's prescribed methimazole dosage.

187. Motley entered the word "refusal" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

188. On March 31, 2023, Defendant Green, MA failed to administer Mr. Mobley's prescribed Methimazole dosage.

189. Green entered the word "refusal" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

190. By the end of March, Mr. Mobley continued to present with clinical symptoms of mania, specifically with moods and behaviors that alternated between heightened agitation and low energy, along with overt defiance and hyper-sexuality.

191. The presentation of Mr. Mobley's symptoms, individually, can indicate possible schizoaffective relapse, but occurring together, are known as the hallmarks of relapse into active schizoaffective disorder.

192. In the month of March 2023, at least four different medical staff had provided some level of medical and or mental health care to Mr. Mobley. But neither during nor after any encounter, did any of the four take any steps to ensure he received his missed mental health medication and none of the four took any steps to have Mr. Mobley evaluated and treated by a psychiatrist.

193. On April 15, 2023, Defendant Brice, MA failed to administer Mr. Mobley's prescribed methimazole dosage.

194. Brice entered the word "refusal" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

195. By April 15th, Mr. Mobley had been deprived of nearly 60 doses of Invega, and he continued to present with symptoms of schizoaffective relapse. Despite this, no member of MCDCC detention staff or medical staff took any steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

196. On April 15, 2023, MCDCC Pod Supervisor Defendant D.O. Lewis failed to properly respond to Mr. Mobley's symptoms of acute mania and recurrence of psychotic symptoms. D.O. Lewis failed to seek psychiatric intervention for Mr. Mobley and instead D.O. Lewis locked Mr. Mobley in his cell, alone, for four and a half hours.

197. D.O. Lewis' supervisors, Defendants Sgt. Langford and Capt. Buchanan, reviewed Lewis' April 15th documentation concerning Mr. Mobley's symptoms. Despite Lewis' report confirming that Mr. Mobley was exhibiting symptoms of acute mania and recurrence of historical psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder, neither Sgt. Langford nor Capt. Buchanan took steps to have Mr. Mobley evaluated and treated by a psychiatrist or be administered Invega. Instead, both supervisors approved of Lewis' action to lock Mr. Mobley alone in a cell.

198. On April 23, 2023, Defendant Louallen, MA failed to administer Mr. Mobley's prescribed methimazole dosage.

199. Louallen entered the word "refusal" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

200. On April 25, 2023, Defendant Mortel, LPN failed to administer Mr. Mobley's prescribed methimazole dosage.

201. Mortel entered the word "refusal" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

202. On April 30, 2023, Defendant Williamson, LPN again, failed to administer Mr. Mobley's prescribed methimazole dosage.

203.    Williamson entered the word "refusal" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

204.    By the end of April 2023, at least four different medical staff had provided some level of medical or mental health care to Mr. Mobley. But neither during nor after any encounter did any of the four take any steps to ensure he received his missed medication and none of the four took any steps to have Mr. Mobley evaluated and treated by a psychiatrist.

205.    On May 5, 2023, Defendant Louallen, MA once again failed to administer Mr. Mobley's prescribed methimazole dosage.

206.    Louallen entered the words "In transit fr Pharmacy" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

207.    On May 14, 2023, Louallen, for the third time, failed to administer Mr. Mobley's prescribed methimazole dosage.

208.    As she had done previously, Louallen entered the word "refusal" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

209.    On May 20, 2023, Defendant Ellis, MA failed to administer Mr. Mobley's prescribed methimazole dosage.

210.   Ellis entered the word "refusal" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

211.   By May 20th, Mr. Mobley had been deprived of more than 90 doses of Invega, and he continued to present with symptoms of schizoaffective relapse. Despite this, no member of MCDCC detention staff or medical staff took any steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

212.   By May 20th, Mr. Mobley's symptoms of mania and depression continued, alternating between presentations of heightened agitation and low mood, and behaviors exhibiting overt defiance, with no signs of symptom improvement or abatement.

213.   As Mr. Mobley continued to decompensate, his reports of "missed mental health meds" to his mother, became less frequent and his mood and affect worsened. Valerie Mobley's calls reporting and begging MCDCC staff to provide her son with Invega continued, but to no avail.

214.   On May 21, 2023, Mr. Mobley's symptoms had become even more pronounced, particularly in the presentation of intense agitation and defiance. In response to these symptoms, MCDCC Pod Supervisor, Defendant D.O. Chea ignored Mr. Mobley's psychiatric symptoms, failed to seek psychiatric intervention and instead locked Mr. Mobley into solitary confinement where he was locked alone in a single cell for twenty continuous days, the maximum interval allowed under North Carolina law.

215. Defendants Sgt. Caver and Capt. Payne, D.O. Chea's supervisors, reviewed Chea's May 21st documentation concerning Mr. Mobley's symptoms. Despite Chea's documentation confirming that Mr. Mobley was continuing to exhibit symptoms of acute mania and a recurrence of historical psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder, Sgt. Caver and Capt. Payne took no steps to have Mr. Mobley evaluated and treated by a psychiatrist and instead, both supervisors approved Chea's request to lock Mr. Mobley into solitary confinement for twenty continuous days.

216. MCDCC detention records indicate that Defendant Fair, RN, evaluated Mr. Mobley to determine his clinical eligibility for solitary confinement.

217. There are no records or documents contained within Mr. Mobley's MCDCC records reflecting that Nurse Fair examined Mr. Mobley or considered or evaluated his symptoms indicating acute mania or considered the recurrence of historical psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder.

218. Mr. Mobley's MCDCC medical records are likewise void of any record of the encounter or any indications that Nurse Fair considered Mr. Mobley's chronically missed medications or his deprivation of Invega before Fair deemed Mr. Mobley medically eligible to be locked in solitary confinement for twenty continuous days.

219. There are no records, notes or evidence indicating that Nurse Fair made any inquiries of Mr. Mobley concerning his diagnoses, symptoms, or treatments and she failed to initiate any steps to have Mr. Mobley evaluated by a psychiatrist or

receive Invega treatment before she deemed him medically eligible to be placed in solitary confinement.

220. Based on the decisions instituted by Defendants D.O. Chea, Sgt. Caver and Capt. Payne and the medical clearance issued by Nurse Fair, Mr. Mobley was locked in MCDCC solitary confinement beginning May 21, 2023, until June 9, 2023.

221. On the evening of May 21, 2023, Defendant Ellis failed to administer Mr. Mobley's prescribed methimazole dosage.

222. Ellis entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

223. Upon information and belief, shortly after being locked within MCDCC's solitary confinement cell, Mr. Mobley requested medical care.

224. After being in MCDCC solitary confinement for 48 hours, Mr. Mobley was seen by Defendant Mercado, LCSWA on May 23, 2023.

225. According to the clinical records for the May 23rd encounter, Mercado documented Mr. Mobley's medical history.

226. Included in her documented medical history for Mr. Mobley was his substance abuse and addiction disorder diagnosis dating back to 2018 and his diagnosis of schizoaffective disorder dating back to June of 2022, each contained within his MCDCC medical records.

227. The medical records created by Mercado documenting her May 23rd encounter with Mr. Mobley are void of any notes indicating that Mercado made any

inquiries of Mr. Mobley about his symptoms, his schizoaffective disorder diagnosis, his substance abuse and addiction diagnosis or the treatment for these diagnoses.

228. Mercado noted in her May 23rd records that Mr. Mobley inquired about his next mental health appointment and requested his medication, noting, "Resident want[s] to restart his previous medication" however, Mercado failed to document the name or dosage amount of the previous medication and failed to document that she reported her findings to any MCDCC medical provider.

229. There are no notes, records, or any other indicators that during or after the May 23rd encounter with Mr. Mobley that Mercado took any steps to have Mr. Mobley evaluated or treated by a psychiatrist or be administered Invega.

230. Mr. Mobley's MCDCC detention records leading up to his placement in solitary confinement on May 21st reflect that he was exhibiting chronic, clinically significant symptoms of acute mania and a recurrence of historical psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder. Despite that documented history, Mercado recorded the following in the May 23rd encounter notes:

> *Pod officer reported that resident is doing fine and is eating and drinking daily. MHP communicated with pod officer, and there were no negative reports from custody regarding mental-health related behavior.*

231. Mercado failed to document any clinical basis indicating that she reconciled the entry she created above with the MCDCC detention records documenting that Mr. Mobley was exhibiting symptoms of acute mania and a recurrence of historical psychotic symptoms consistent with his well-established

diagnosis of schizoaffective disorder, as well as medical records confirming he had been deprived of Invega since February 18, 2023. Mercado did not document any clinical basis for her failure to engage a psychiatrist in Mr. Mobley's care.

232.    By Mercado's May 23rd encounter with Mr. Mobley, MCDCC medical staff had issued Mr. Mobley two prescription medications; one to treat hyperthyroidism and a topical antifungal medication, but no medication for the treatment of his schizoaffective disorder. Despite this, Mercado documented the following findings in her May 23rd clinical notes:

> *MHP checked the resident was already on the proper medication.*

233.    There are no notes, records or other documents showing that Mercado took any steps to ensure Mr. Mobley's medication regimen was being carried out or that the regimen was proper or effective.

234.    MCDCC medical records reflect that on May 24, 2023, Defendant Dr. Le-Bliss had a treatment encounter with Mr. Mobley. Dr. Le-Bliss documented Mr. Mobley's hyperthyroidism diagnosis, that Mr. Mobley's blood pressure was borderline high, and Dr. Le-Bliss initiated a prescription topical treatment, Diflucan, for his skin condition.

235.    Based on the medical records created by Dr. Le-Bliss on May 24th, and despite his well-documented medical history, Dr. Le-Bliss failed to make inquiries concerning Mr. Mobley's schizoaffective disorder diagnosis or his substance abuse and addiction diagnosis and did not inquire about any treatment for those diagnoses.

236. Dr. Le-Bliss had access to Mr. Mobley's MCDCC record file. The medical records confirmed that since his February 18th admission to MCDCC, Mr. Mobley's schizoaffective disorder was not being treated with any medication, that Mr. Mobley had not been evaluated by a psychiatrist, and that no member of the MCDCC medical staff contacted or consulted with Mr. Mobley's community treating psychiatrist, Dr. Whitehead.

237. Upon information and belief, Dr. Le-Bliss practices within Atrium Health in Charlotte, the same healthcare organization at which Mr. Mobley's psychiatrist, Dr. Whitehead, practices, yet Le-Bliss never took any steps to contact her colleague, Dr. Whitehead, to consult on Mr. Mobley's care.

238. Mr. Mobley's MCDCC detention records confirmed that Mr. Mobley was exhibiting symptoms of acute mania and a recurrence of historical psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder. Despite the knowledge Mr. Mobley was currently in solitary confinement and despite the information provided in his medical records, Le-Bliss took no steps to have Mr. Mobley evaluated by a psychiatrist or administered Invega.

239. After being locked in solitary confinement for six continuous days, on May 26, 2023, Mr. Mobley was seen by Defendant Doe 3.

240. Based on the medical records created by Defendant Doe 3 for the May 26th treatment encounter, Defendant Doe 3 made no inquiries concerning Mr. Mobley's mental health diagnoses and made no inquiry about the treatment and management of his diagnoses.

241. At the May 26th encounter with Mr. Mobley, Defendant Doe 3 documented that "Adherence to psychiatric medications" was not applicable ("n/a") to Mr. Mobley's diagnoses, care, and treatment. Defendant Doe 3 failed to document any clinical basis for finding that adherence to psychiatric medications did not apply to Mr. Mobley's diagnoses of schizoaffective disorder and substance abuse and addiction disorder.

242. Additional clinical notes made by Defendant Doe 3 from the May 26th medical record state the following:

> *Mental Health Professional identified himself to resident and questioned him as to whether there was anything that he needed from Mental Health Services. MHP noted that resident had not been displaying any odd or irrational behavior during intervention. Pod Supervisor stated that resident had been calm and had been both eating and drinking during the day. No complaints*

243. Upon information and belief, Doe 3 had access to Mr. Mobley's medical and detention records. The medical records confirm that since his February 18th admission to MDCC, Mr. Mobley's schizoaffective disorder was not being treated and that he had not been evaluated by a psychiatrist. His detention records confirmed that the reason Mr. Mobley was in solitary confinement was that Mr. Mobley was exhibiting symptoms of acute mania and a recurrence of historical psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder.

244. Despite the knowledge and insight provided by his medical and detention records, Doe 3 took no steps to have Mr. Mobley evaluated and treated by a psychiatrist or administered Invega.

245.    During that time, Valerie Mobley continued her quest to try to ensure her son's schizoaffective disorder was being treated; she continued to try to get her son his Invega treatments by calling to report her son's condition and beg MCDCC staff to allow her to speak with a member of Sheriff McFadden's medical staff.

246.    In response to her efforts, no member of Sheriff McFadden's staff ever responded or communicated with Mrs. Mobley about her son's diagnoses or treatment needs.

247.    On May 26, 2023, and every month thereafter, without examining, evaluating or even speaking to Mr. Mobley, and without consulting with a psychiatrist, Defendant Atabong, NP issued a 30-day prescription for 1 mg of benztropine, a medication used to treat tremors and muscular disorders, as well as offset some of the side effects of antipsychotics. Atabong ordered that medication be administered twice per day for 30 days. Atabong failed to document any clinical basis for his prescribing decisions and failed to issue Mr. Mobley a prescription for Invega.

248.    On that same day, also without examining, evaluating or even speaking to Mr. Mobley, and without consulting with a psychiatrist, Defendant Noltemeyer, NP issued Mr. Mobley a 90-day prescription for 1 mg oral tablets of risperidone, a prescription medication used for the treatment of brain disorders, including schizoaffective disorder. Noltemeyer ordered that the medication be administered twice per day for 90 days.

249.    There are no records indicating that Noltemeyer or any other MCDCC staff member ever oversaw, managed or followed up to determine Mr. Mobley's

response to the newly prescribed medication, and Noltemeyer renewed the prescription three times, every 90 days, without ever evaluating or speaking with Mr. Mobley about the efficacy of the medication and at no time did he ever consult with a psychiatrist about Mr. Mobley's care.

250.    Risperidone is the same medication previously discontinued by Dr. Whitehead because Mr. Mobley's condition proved to be resistant and non-responsive to risperidone.

251.    Noltemeyer neither made any records, nor documented the clinical basis for prescribing risperidone, nor did he consult with a psychiatrist for the prescribing decision. Likewise, he failed to document the basis for his clinical decision not to prescribe Invega to Mr. Mobley and failed to refer Mr. Mobley to a psychiatrist.

252.    On May 26, 2023, Defendant Gilbert, LPN failed to administer doses of risperidone and benztropine to Mr. Mobley.

253.    Gilbert entered the words "Hold One Med Pass" into the corresponding medication administration logs and took no steps to ensure that Mr. Mobley received his missed medications.

254.    During the 20-day period that MCDCC detention staff locked Mr. Mobley in solitary confinement, he made a total of twelve submissions through the MCDCC communication kiosk. The nature of his submissions ranged from calendar requests, to requests for religious materials to other submissions evidencing symptoms of acute mania, paranoia, and the delusions from which he suffered, all of which were consistent with his well-established diagnosis of schizoaffective disorder.

255. There are no records or information documenting that Sheriff McFadden or any of his employees or agents ever assessed, evaluated, or considered that Mr. Mobley's writings submitted via the MCDCC communication kiosk were consistent with his other symptoms of schizophrenic relapse.

256. More specifically, Mr. Mobley's MCDCC medical records are void of any notes or entries documenting the paranoia, anxiety, and hyper-religiosity that Mr. Mobley was experiencing as evidenced through his requests and writings submitted through the MCDCC communication kiosk. Those writings were symptoms exhibiting acute mania and a recurrence of historical psychotic symptoms that were consistent with his well-established diagnosis of schizoaffective disorder.

257. While MCDCC detention staff locked Mr. Mobley in solitary confinement from May 21st until June 9th, he had no contact with his mother. The abrupt, unexplained halt in communication from her son caused Mrs. Mobley to grow even more concerned about his condition and well-being.

258. Her fear and concern caused Mrs. Mobley to yet again contact MCDCC staff and make requests that her son's mental health needs be addressed and treated. During this period, Mrs. Mobley's calls included additional requests that the MCDCC staff confirm that her son's health and well-being had not been compromised.

259. When she called MCDCC, Mrs. Mobley explained to the MCDCC staff that there had been an unexplained halt in communication from her son and that based on his diagnoses, she had concerns about his well-being and requested confirmation from MCDCC staff that Mr. Mobley was okay.

260.   Despite her repeated requests, none of Sheriff McFadden's staff ever followed up with or responded to Mrs. Mobley's requests concerning Mr. Mobley's well-being, medication, or care.

261.   Sometime during the evening hours of June 9, 2023, MCDCC detention officers released Mr. Mobley from solitary confinement and placed him back into a general population housing unit.

262.   Between May 21st and June 9th, at least eight different medical staff had provided some level of medical and or mental health care to Mr. Mobley. But neither during nor after any encounter, did the eight take any steps to ensure he received his missed mental health medication and none of the eight took any steps to have Mr. Mobley evaluated and treated by a psychiatrist.

263.   By the time Mr. Mobley was released from solitary confinement on June 9th, he had been deprived of nearly 120 doses of Invega, and he continued to exhibit symptoms of acute mania and a recurrence of historical psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder.

264.   On June 19, 2023, Defendant Eden, MA failed to administer all prescription medications, risperidone, methimazole, Diflucan and benztropine, that had been prescribed to Mr. Mobley.

265.   Eden entered the word "refusal" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received any of the missed medications.

266. On June 23, 2023, MCDCC records show that Defendants Sgt. Langford and Sgt. Martinez were assigned supervisory duties of residents in Pod 1800, where Mr. Mobley was housed.

267. On that day, Sgts. Langford and Martinez discovered Mr. Mobley had been smoking an illicit substance within his cell.

268. In response to the discovery, neither Langford nor Martinez documented any investigation of the incident. Based on the records created, neither Defendant Langford nor Martinez took any steps to identify the substance ingested by Mr. Mobley.

269. Based on the MCDCC records, neither Langford nor Martinez took any steps to determine how the substance was brought into MCDCC or how Mr. Mobley acquired the illicit substance.

270. Based on the MCDCC records, neither Defendant Langford nor Martinez questioned any of the other Pod 1800 residents to try to make any determinations about the substance Mr. Mobley ingested on June 23rd.

271. Despite discovering that Mr. Mobley was ingesting an illicit substance, both Langford and Martinez failed to take any steps toward clinical intervention in response to Mr. Mobley's act of self-medicating, including failing to take any steps to have Mr. Mobley evaluated and treated by a psychiatrist. Instead, Defendant Langford locked Mr. Mobley into solitary confinement.

272. Defendant Capt. Buchanan, Langford's supervisor, reviewed Langford's June 23rd documentation regarding Mr. Mobley. Despite Langford's documentation

confirming that Mr. Mobley was actively self-medicating, Capt. Buchanan not only failed to take steps to have Mr. Mobley evaluated and treated by a psychiatrist or administered Invega but instead approved of Langford's decision to lock Mr. Mobley into solitary confinement.

273.    MCDCC detention records indicate that Nurse Williams evaluated Mr. Mobley to determine his medical eligibility for solitary confinement.

274.    There are no records or documents contained within any of Mr. Mobley's MCDCC medical records reflecting that Nurse Williams considered Mr. Mobley's symptoms, that he had engaged in active self-medicating, his diagnosis of schizoaffective disorder, his diagnosis of substance abuse and addiction disorder, or his unmedicated state, before deeming him medically eligible for solitary confinement on June 23, 2023.

275.    Mr. Mobley's MCDCC medical and detention records are void of any evidence that Williams examined, evaluated or made any inquiry of Mr. Mobley concerning his diagnoses, symptoms, treatments, or the reason he sought to self-medicate.  Williams took no steps for Mr. Mobley to be evaluated by a psychiatrist before, during or after he was locked into solitary confinement.

276.    Based on the decisions instituted by Sgt. Langford, and approved by Capt. Buchanan, and the medical clearance issued by Nurse Williams, Mr. Mobley was locked into solitary confinement for an undocumented period of time.

277.    In June of 2023, Mr. Mobley began to make repeated requests to MCDCC staff to be transferred from general population to MCDCC's Behavioral Health unit.

278.    On July 10, 2023, Defendant Doe 4 documented a treatment encounter with Mr. Mobley.

279.    Doe 4 documented that the purpose of the treatment encounter was to discuss the implementation of a behavioral plan in response to Mr. Mobley's repeated requests to be transferred to MCDCC's Behavioral Health Unit.

280.    During the July 10th treatment encounter, Doe 4 documented that Mr. Mobley's stated purpose for transfer to the Behavioral Health Unit was his desire to be able "to work once admitted".

281.    Despite well-documented evidence that Mr. Mobley continued to exhibit symptoms of acute mania and continued recurrence of historical psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder and well-documented records of chronically missed medications, Doe 4 documented that Mr. Mobley was "medication adherent" and that he was otherwise "appropriate" during the July 10th encounter.

282.    On July 17, 2023, Defendant Brice, MA failed to administer doses of risperidone, methimazole and benztropine to Mr. Mobley.

283.    Brice entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

284. On July 18, 2023, Defendant Doe 5 had a treatment encounter with Mr. Mobley.

285. Regarding the July 18th treatment encounter, Defendant Doe 5 documented the following:

> "*Went to give out and have Behavioral Contract Signed*"

286. Doe 5 completed the encounter form and checked the pre-printed boxes indicating that Mr. Mobley's behavior, speech, and mood were each appropriate, clear, and unremarkable, respectively.

287. Doe 5 made no notes and did not document making any inquiry of Mr. Mobley concerning his schizoaffective or substance abuse and addiction disorders or associated treatments.

288. Despite MCDCC medical records reflecting Mr. Mobley's history of chronically missed medications and that all evening doses of his medications were missed on July 17th, Doe 5 documented that Mr. Mobley was "medication adherent" on July 18th and failed to provide any explanation for documenting medication adherence for Mr. Mobley when his medication records were to the contrary.

289. Doe 5 documented Mr. Mobley decided to go to GED instead of the Behavioral Health Unit

290. Despite Mr. Mobley's diagnoses, his request to transfer to the MCDCC Behavioral Health Unit, and his ongoing presentation of symptoms, Defendant Doe 5 took no steps to refer Mr. Mobley for evaluation and treatment by a psychiatrist or administered Invega.

291. On July 31, 2023, Defendant Gilbert, LPN failed yet again to administer doses of risperidone and benztropine to Mr. Mobley.

292. Gilbert entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

293. During July 2023, at least four different medical staff provided some level of medical and or mental health care to Mr. Mobley. But neither during nor after any encounter did the four take any steps to ensure he received his missed mental health medication and none of the four took any steps for Mr. Mobley to be evaluated and treated by a psychiatrist.

294. On August 10, Defendant Dr. Le-Bliss ordered an ultrasound to confirm that one of Mr. Mobley's kidneys had been removed but did not inquire about his mental health medications or refer him to a psychiatrist.

295. By August 18th, Mr. Mobley had been deprived of nearly 180 doses of Invega, and he continued to present with symptoms of schizoaffective relapse. Despite this, no member of MCDCC detention staff or medical staff took any steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

296. Again, on August 12, 2023, Defendant Gilbert, LPN failed to administer doses of risperidone and benztropine to Mr. Mobley.

297. And once again, Gilbert entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

298.     On August 18, 2023, Defendant Green, MA failed to administer doses of risperidone and benztropine to Mr. Mobley.

299.     Green entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

300.     By the end of August 2023, at least three different medical staff, including a licensed physician, provided some level of medical and or mental health care to Mr. Mobley. But neither during nor after any of the encounters did any of the three take any steps to ensure he received his missed mental health medication and none of the three took any steps to have Mr. Mobley evaluated and treated by a psychiatrist.

301.     Throughout September, Mr. Mobley continued to exhibit symptoms of acute mania and recurrence of historical psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder.

302.     On September 6, 2023, Defendant Smith, MA failed to administer doses of risperidone and benztropine to Mr. Mobley.

303.     Smith entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

304.     On September 7, 2023, Defendant Gilbert, LPN yet again failed to administer doses of risperidone and benztropine to Mr. Mobley.

305. Gilbert entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medication.

306. On September 11th, 14th, 16th and 18th Defendant Eden, MA failed to administer doses of risperidone and benztropine to Mr. Mobley.

307. Eden entered the word "refused" into the corresponding medication administration log for each of the dates, except for September 18th, where she instead entered the words, "out of unit" and Defendant Eden took no steps ensure that Mr. Mobley received any of his missed medications.

308. On September 21, 2023, Defendant Moore, LPN failed to administer doses of risperidone and benztropine to Mr. Mobley.

309. Moore entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

310. On September 28, 2023, Defendant Louallen, MA yet again, failed to administer doses of risperidone and benztropine to Mr. Mobley.

311. As she had done previously, Louallen entered the word "refused" into the corresponding medication administration log and again took no steps to ensure that Mr. Mobley received his missed medications.

312. In September of 2023, at least eight different medical staff failed to administer 18 separate doses of medication to Mr. Mobley, and he continued to present with symptoms of schizoaffective relapse. Despite this, no member of MCDCC

detention staff or medical staff took any steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

313.    In October of 2023, Mr. Mobley continued to exhibit symptoms of acute mania and recurrence of historical psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder.

314.    On October 5th, 6th and 13th of 2023 Defendant Wasson, LPN failed to administer doses of risperidone and benztropine to Mr. Mobley.

315.    Wasson entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

316.    On October 9th and 16th of 2023, Defendant Eden, MA once again failed to administer doses of risperidone and benztropine to Mr. Mobley.

317.    As she had previously done, Eden entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

318.    On October 11, 2023, Defendant Gilbert, LPN, yet again, failed to administer doses of risperidone and benztropine to Mr. Mobley.

319.    Gilbert entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

320.    Mr. Mobley was scheduled for a chronic medical care follow-up encounter for the management of his Hyperthyroidism diagnosis on October 23, 2023.

321.    According to MCDCC medical records Defendant Doe 6 documented that Mr. Mobley refused to report to the scheduled appointment and MCDCC Detention Officer Dowd signed as a witness to the documentation.

322.    Based on the MCDCC medical record for October 23rd, neither Doe 6 nor Officer Dowd took any steps to address the status of Mr. Mobley's medical needs, including taking any steps to have him evaluated and treated by a psychiatrist or administered Invega, despite the clinical significance of his symptoms which by then, included an increased level of disengagement.

323.    On October 26, 2023, MCDCC Pod Supervisor, Defendant D.O. Garris documented that she discovered Mr. Mobley smoking an illicit substance in his cell, Cell #3, in Pod 1900.

324.    In response to the discovery, D.O. Garris documented that she contacted Defendants Sgt. Neece and Capt. Payne, two members of MCDCC supervisory staff, and requested that they review the video surveillance footage of Pod 1900 that had been recorded earlier.

325.    Defendant Sgt. Neece and Captain Payne reported to D.O. Garris that the footage revealed that several MCDCC residents within Pod 1900 were entering Cell #3 to smoke.

326.    D.O. Garris failed to document any information concerning any investigation of the incident. She failed to make any record whatsoever identifying the substances consumed or any seizure thereof.

327. D.O. Garris failed to make any record concerning whether any paraphernalia or contraband was collected after she made her discovery. Garris also failed to document whether any inquiries were made of Pod 1900 residents concerning the illicit substance such as how the substances entered MCDCC and where and how the substance was acquired.

328. There are no records documenting that any MCDCC staff members were ever interviewed or investigated related to this incident.

329. Despite discovering that Mr. Mobley was consuming an illicit substance, D.O. Garris failed to take any steps toward clinical intervention in response to Mr. Mobley's act of self-medicating, including failing to take any steps to have Mr. Mobley evaluated and treated by a psychiatrist. Instead, Garris locked Mr. Mobley into solitary confinement.

330. Sgt. Neece and Capt. Payne reviewed Garris' October 26th report concerning Mr. Mobley. Despite Garris' documentation confirming that Mr. Mobley was continuing to exhibit symptoms of acute mania and was actively self-medicating, Sgt. Neece and Capt. Payne not only failed to take steps to have Mr. Mobley evaluated and treated by a psychiatrist or administered Invega, but instead both supervisors approved of Garris' decision to lock Mr. Mobley into solitary confinement.

331. MCDCC detention records indicate that Defendant Thompson, RN evaluated Mr. Mobley to determine his medical eligibility for solitary confinement.

332. There are no records or documents contained within any of Mr. Mobley's MCDCC detention or medical records reflecting that Nurse Thompson examined or

evaluated Mr. Mobley or that Thompson reviewed Mr. Mobley's well-documented medical history or considered that Mr. Mobley was exhibiting symptoms of acute mania, psychotic symptoms consistent with his well-established diagnosis of schizoaffective disorder and was engaging in active self-medicating, before deeming him medically eligible for solitary confinement.

333.   Mr. Mobley's MCDCC medical and detention records are void of any evidence that Thompson made any inquiry of Mr. Mobley concerning his diagnoses, symptoms, treatments, or the reason he sought to self-medicate. Nurse Thompson took no steps to have Mr. Mobley evaluated or treated by a psychiatrist before, during or after he was locked into solitary confinement.

334.   Based on the decisions instituted by D.O. Garris and approved by Sgt. Neece and Capt. Payne and the medical clearance issued by Nurse Thompson, Mr. Mobley was locked into solitary confinement for yet another undocumented period of time.

335.   In October 2023, at least five different MCDCC medical staff, including Nurse Thompson, failed to administer at least 14 separate doses of medication to Mr. Mobley. But neither during nor after any encounter did the five take any steps to ensure he received his missed mental health medication and none of the four took any steps for Mr. Mobley to be evaluated and treated by a psychiatrist.

336.   Once again, on November 8th, 10th, 12th, 15th, 20th, 22nd and 26th Defendant Gilbert failed to administer doses of risperidone and benztropine to Mr. Mobley.

337. Gilbert entered the word "refused" into the corresponding medication administration logs as she had done a half dozen times before and took no steps to address Mr. Mobley's missed medications.

338. Mr. Mobley was scheduled for a chronic medical care follow-up appointment for the management of his Hyperthyroidism on November 14, 2023.

339. Defendant Doe 7 documented that Mr. Mobley refused to report to the scheduled appointment and MCDCC Detention Officer John signed as a witness to the medical record.

340. Based on the medical record for the November 14th appointment, neither Defendant Doe 7, nor Officer John, took any steps to address Mr. Mobley's medical needs or took any steps to have Mr. Mobley evaluated and treated by a psychiatrist.

341. Based on the MCDCC medical record for November 14th, neither Doe 7 nor Officer John took any steps to address the status of Mr. Mobley's medical needs, including taking any steps to have him evaluated and treated by a psychiatrist or administered Invega, despite the clinical significance of his symptoms which by then, included not just an increased level of disengagement, but a pattern of increased disengagement.

342. By November 18, 2023, Mr. Mobley had been deprived of nearly 180 doses of Invega, and he continued to present with symptoms of schizoaffective relapse. Despite this, no member of MCDCC detention staff or medical staff took any

steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

343. On November 24, 2023, Defendant Mortel, LPN again failed to administer doses of risperidone and benztropine to Mr. Mobley.

344. Mortel entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

345. In November 2023, at least four different medical staff had provided some level of medical and or mental health care to Mr. Mobley. But neither during nor after any encounter, did the four take any steps to ensure he received his missed mental health medication and none of the four took any steps to have Mr. Mobley evaluated and treated by a psychiatrist.

346. On December 1st, 4th, 5th, 10th, 11th, 20th, and 23rd, Defendant Gilbert, LPN repeatedly failed to administer doses of risperidone and benztropine to Mr. Mobley.

347. On December 2, 2023, Defendant Mortel, LPN yet again failed to administer doses of risperidone and benztropine to Mr. Mobley.

348. Mortel entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

349. On December 3, 2023, Defendant Moore, LPN once again failed to administer doses of risperidone and benztropine to Mr. Mobley.

350.    As she had done previously, Moore entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

351.    On December 8, 2023, Defendant Ellis, MA again failed to administer doses of risperidone and benztropine to Mr. Mobley.

352.    Ellis entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

353.    On December 14th and 24th of 2023, Defendant Wasson, LPN failed to administer doses of risperidone and benztropine to Mr. Mobley.

354.    Wasson entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

355.    On December 18, 2023, Defendant Eden, MA again failed to administer doses of risperidone and benztropine to Mr. Mobley.

356.    Eden entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

357.    By December 18, 2023, Mr. Mobley had been deprived of more than 200 doses of Invega, and he continued to present with symptoms of schizoaffective relapse. Despite this, no member of MCDCC detention staff or medical staff took any

steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

358.    On December 19, 2023, without examining, evaluating or even speaking to Mr. Mobley, and without consulting with a psychiatrist, Defendant Atabong, NP, renewed Mr. Mobley's prescription for Benztropine.

359.    By December 20th, Gilbert had failed to administer a total of 36 separate doses of medication to Mr. Mobley, and he continued to present with symptoms of schizoaffective relapse. Despite a volume as great as 36 separate doses and Mr. Mobley's continued symptoms, Gilbert was permitted to continue to enter the word "refused" into the medication administration logs and was permitted to take no further steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

360.    On December 25th, 26th, 27th and 31st of 2023, Defendant Green, MA repeatedly failed to administer doses of risperidone and benztropine to Mr. Mobley.

361.    Green entered the word "refused" into the corresponding medication administration logs and took no steps to ensure that Mr. Mobley received his missed medications.

362.    In December of 2023, at least seven different medical staff had provided some level of medical and or mental health care to Mr. Mobley. But neither during nor after any encounter did the seven take any steps to ensure he received his missed mental health medication and none of the seven took any steps to have Mr. Mobley evaluated and treated by a psychiatrist.

363.  On January 1, 2024, Defendant Green, MA once again failed to administer doses of risperidone and benztropine to Mr. Mobley.

364.  Just as she had done days earlier, Green entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

365.  On January 5, 2024, Defendant Ellis again failed to administer doses of risperidone and benztropine to Mr. Mobley.

366.  Ellis again entered the word "refused" into the corresponding medication administration log and took no steps to address Mr. Mobley's missed medications.

367.  On January 8, 2024, for the twentieth time since May of 2023, Defendant Gilbert, LPN failed to administer doses of risperidone and benztropine to Mr. Mobley.

368.  Gilbert entered the word "refused" into the corresponding medication administration log and took no steps to address Mr. Mobley's missed medications.

369.  On January 10th, 12th, 16th, 17th, and 20th, Gilbert repeatedly failed to administer doses of risperidone and benztropine to Mr. Mobley.

370.  Gilbert entered the word "refused" into the corresponding medication administration logs and took no steps to address Mr. Mobley's missed medications.

371.  As she'd been permitted to do for the other 40 doses of medication she had failed to administer by that time, Gilbert again entered the word "refused" into

the corresponding medication administration logs and took no steps to address Mr. Mobley's missed medications.

372. On January 11, 2024, Defendant Motley, LPN failed to administer doses of risperidone and benztropine to Mr. Mobley.

373. Motley entered the word "refused" into the corresponding medication administration log and took no steps to address Mr. Mobley's missed medications.

374. On January 13, 2024, Defendant Slade, LPN failed to administer doses of risperidone and benztropine to Mr. Mobley.

375. Slade entered the word "refused" into the corresponding medication administration log and took no steps to address Mr. Mobley's missed medications.

376. By January 18, 2024, Mr. Mobley had been deprived of approximately 330 doses of Invega, and he continued to present with symptoms of schizoaffective relapse. Despite this, no member of MCDCC detention staff or medical staff took any steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

377. On January 19, 2024, without examining, evaluating or even speaking to Mr. Mobley, and without consulting with a psychiatrist, Defendant Noltemeyer, NP, renewed Mr. Mobley's prescriptions for benztropine and risperidone. Noltemeyer did not refer Mr. Mobley for evaluation by the psychiatrist.

378. On January 25th and 29th of 2024, Defendant Mortel, LPN again failed to administer doses of risperidone and benztropine to Mr. Mobley.

379. Mortel again entered the words "refused" into the corresponding medication administration log each time and took no steps to address Mr. Mobley's missed medications.

380. During the "am" MCDCC medication administration shift on January 28, 2024, Defendant Moore, LPN yet again failed to administer doses of risperidone and benztropine to Mr. Mobley.

381. Moore again entered the word "refused" into the corresponding medication administration log and took no steps to address Mr. Mobley's missed medications.

382. During the "pm" medication administration shift on January 28, 2024, Defendant Ellis, MA failed to administer doses of risperidone and benztropine to Mr. Mobley.

383. Ellis entered the word "refused" into the corresponding medication administration log and took no steps to address Mr. Mobley's missed medications.

384. On January 31, 2024, according to Mr. Mobley's medical records, Defendant Doe 8, completed a pre-printed form entitled, "Staff Referral Form-Mental Health" concerning Mr. Mobley's care.

385. The medical record completed by Doe 8 reflects the encounter classification type as "routine" and the type of mental health professional as "psychiatric provider". The clinical notes within the document state the following:

> *Patient has refused the following number of doses in the last seven days. benztropine 4 mobley 4 Additional information (including interim actions taken): medication refusals.*

386. There are no MCDCC records, medical, detention or otherwise, that indicate that any steps were taken to follow through on the referral and ensure that Mr. Mobley was evaluated by a psychiatric provider as requested in the document created by Doe 8 on January 31, 2024.

387. In January of 2024, at least nine different medical staff had provided some level of medical and or mental health care to Mr. Mobley. But neither during nor after any encounter did the nine take any steps to ensure he received his missed mental health medication and none of the nine took any steps for Mr. Mobley to be evaluated and treated by a psychiatrist.

388. On February 2nd, 13th, 16th and 29th of 2024, Defendant Smith, MA failed to administer doses of risperidone and benztropine to Mr. Mobley.

389. Smith entered the words "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

390. On February 5th, 7th, 21st and 28th of 2024, Defendant Gilbert, LPN repeatedly failed to administer doses of risperidone and benztropine to Mr. Mobley.

391. By February 28th, Gilbert had failed to administer a total of 62 separate doses of medication to Mr. Mobley, and he continued to present with symptoms of schizoaffective relapse. Despite a volume as great as 62 separate doses and Mr. Mobley's continued symptoms, Gilbert was permitted to continue to enter the word "refused" into the medication administration logs and was permitted to take no

further steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

392. On February 11th and 25th of 2024, Defendant Green, LPN again failed to administer doses of risperidone and benztropine to Mr. Mobley.

393. Green entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

394. On February 25, 2024, Defendant Bashaka, MA failed to administer doses of risperidone and benztropine to Mr. Mobley.

395. Bashaka entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

396. In February of 2024, at least seven different MCDCC medical staff failed to administer at least 34 separate doses of medication and he continued to present with symptoms of schizoaffective relapse. Despite this, no member of MCDCC detention staff or medical staff took any steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

397. On March 2nd, 3rd and 4th of 2024, Defendant Gilbert, LPN repeatedly failed to administer doses of risperidone and benztropine to Mr. Mobley.

398. By March 4, 2024, Gilbert had failed to administer a total of 68 separate doses of medication to Mr. Mobley, and he continued to present with symptoms of schizoaffective relapse. Despite a volume as great as 62 separate doses and Mr.

Mobley's continued symptoms, Gilbert was permitted to continue to enter the word "refused" into the medication administration logs and was permitted to take no further steps to have Mr. Mobley evaluated and treated by a psychiatrist or to receive Invega medication.

399.    On March 8, 2024, Defendant Smith, MA failed yet again to administer risperidone and benztropine to Mr. Mobley.

400.    Smith entered the words "refused" into the corresponding medication administration logs and took no steps to address Mr. Mobley's missed medications.

401.    On March 9, 2024, Defendant Moore, LPN failed again to administer risperidone and benztropine to Mr. Mobley.

402.    Moore entered the words "refused" into the corresponding medication administration logs and took no steps to address Mr. Mobley's missed medications.

403.    During the afternoon hours of March 12, 2024, Mr. Mobley, through custodial transport, was delivered from MCDCC to the Gaston County Jail under Writ of Habeas Corpus issued by the Gaston County District Court.

404.    Mr. Mobley was under the care and custody of the Gaston County Sheriff for less than 72 hours, from March 12th through the morning of March 15th, when he was delivered via custodial transfer, back to MCDCC.

**E.    DETENTION AND MEDICAL CARE MARCH 15, 2024 - MARCH 26, 2024**

405.    At approximately 9:20 a.m. on March 15, 2024, Mr. Mobley was processed for intake at the MCDCC and submitted to the full-body scanning system.

406.    The results of the MCDCC full-body scan confirmed that Mr. Mobley was free from any contraband on or within his body.

407.    MCDCC records reflect that Mr. Mobley's intake process on March 15, 2024 was free from any complications or irregularities and was documented as typical arrest, receiving, and processing events.

408.    MCDCC records confirm that Mr. Mobley processed through each of the intake posts and was eventually assigned to reside in general population within Pod 3900.

409.    MCDCC Pod 3900 is a two-story pod with individual cells aligning perimeter walls of both first and second floors and an open common area in the center, occupying the middle of the first floor. The open common area, known as the day room, is outfitted with permanent tables, as well as chairs and sofas. The MCDCC detention officer assigned to Pod 3900 has use of a podium style desk which is positioned in the day room near the pod's main entrance.

410.    From March 16, 2024, until March 27, 2024, Mr. Mobley resided in Pod 3900 and was assigned to cell # 17.

411.    On March 21st, 23rd and 24th of 2024, Defendant Bashaka, MA again failed to administer risperidone and benztropine to Mr. Mobley.

412.    Bashaka entered the words "refused" into the corresponding medication administration log each time and took no steps to ensure that Mr. Mobley saw a psychiatrist or received any of his missed medications.

413.  On March 26, 2024, Defendant Slade, LPN failed again to administer doses of risperidone and benztropine to Mr. Mobley.

414.  Slade entered the word "refused" into the corresponding medication administration log and took no steps to ensure that Mr. Mobley received his missed medications.

415.  During the month of March, before his death on March 27, 2024, at least six different medical staff failed to administer at least 20 separate doses of medication to Mr. Mobley. None took any steps to ensure he received any of the missed medications and none of the six took any steps to have Mr. Mobley evaluated by a psychiatrist.

416.  In addition to the instances in the preceding paragraphs, at least a dozen other medical staff, in addition to the Medical Defendants, were permitted to deprive Mr. Mobley of his medication and failed to have Mr. Mobley evaluated and treated by a psychiatrist.

417.  In fact, there are no records documenting that Mr. Mobley was ever evaluated or treated by a psychiatrist at any point while in the care and custody of Sheriff McFadden following his February 18, 2023 admission into MCDCC.

418. By March 27, 2024, while under the exclusive care and custody of Defendant Sheriff McFadden, Mr. Mobley had been deprived of 412 doses of Invega, the medication that historically had successfully managed his schizoaffective disorder.

## F.    MR. MOBLEY'S MEDICAL EMERGENCY AND DEATH

419.    On March 26, 2024, Defendant D.O. Jaquez was assigned as the Pod Supervisor in charge of Pod 3900 for the twelve-hour shift that began at or around 8:00 p.m. through 8:00 a.m. on March 27, 2024.

420.    Upon information and belief, sometime at or around 9:15 pm on March 26, 2024, Mr. Mobley was seated at a table in the open common area in Pod 3900. He appeared unwell and was unresponsive to fellow residents who tried to communicate with him.

421.    Upon information and belief, D.O. Jaquez alerted residents in Pod 3900 that the medication cart would be arriving shortly, which under MCDCC rules required that residents return to their respective cells.

422.    Upon information and belief, when fellow Pod 3900 residents began to return to their respective cells, Mr. Mobley failed to respond similarly and instead, appeared physically and mentally "out of it". He appeared dazed and unresponsive, and remained seated at the table in the common area.

423.    Upon information and belief, three fellow residents, Christopher Chisolm, Columbus Washington, and Dallas Brand then physically assisted Mr. Mobley and helped him to a standing position.

424.    Residents Chisolm, Washington, and Brand then physically assisted Mr. Mobley because he was unable to independently ambulate and they helped move him back toward his cell.

425.    Upon information and belief, Mr. Mobley's condition garnered the

attention of D.O. Jaquez, who inquired whether Mr. Mobley was "okay". Fellow residents assisting Mr. Mobley reported that they were unsure whether Mr. Mobley was "okay."

426. In response to witnessing Mr. Mobley's condition, D.O. Jaquez took no further action to check on Mr. Mobley's well-being or safety before he entered his cell.

427. Upon information and belief, residents Rayshwan Strong, Marquis Smith and Jamal Allen observed Mr. Mobley's concerning condition and watched residents Chisolm, Washington and Brand assist Mr. Mobley into his assigned cell # 17.

428. Upon information and belief, residents Chisolm, Washington and Brand placed Mr. Mobley on the side of his bed in cell # 17, exited the lit cell, and returned to their respective cells, as required under MCDCC rules.

429. Upon information and belief, several minutes passed, and D.O. Jaquez still took no steps to verify Mr. Mobley's well-being, to provide him with any assistance, or to seek any assistance for him from MCDCC medical staff.

430. Upon information and belief, at some time at or around 9:45pm, while the MCDCC medication cart was onsite in Pod 3900, Mr. Mobley exited his lit cell and approached the podium desk behind which D.O. Jaquez was seated.

431. At that time, Mr. Mobley was struggling to stand and hold himself upright, and while slumped over the podium desk, Mr. Mobley reported to D.O. Jaquez that he was not feeling well.

432. Upon information and belief, D.O. Jaquez made no inquiries about Mr.

Mobley's health or well-being, nor did he request any medical assistance for Mr. Mobley, but instead D.O. Jaquez gestured with his arm and ordered Mr. Mobley to return to his cell telling him to, "Get away from my podium".

433. Mr. Mobley then briefly rested in a chair near the podium before eventually making his way back to his cell while D.O. Jaquez instituted the 10 p.m. final daily lockdown of Pod 3900.

434. Unlike the instances when Mr. Mobley was locked in solitary confinement and a nurse was called to deem him medically eligible, when Mr. Mobley appeared very ill and requested medical attention, none was provided for him.

435. According to rule 10A North Carolina Administrative Code 14J .0601(a), detention officers are required to make supervision rounds and observe each inmate at least two times per hour, on an irregular basis, with no more than 40 minutes between rounds.

436. According to Sheriff McFadden's written policies for the MCDCC, in order to meet requirements of 10A Code 14J in the execution of pod tour duties, MCDCC Officers are responsible for actually looking into each resident's cell, to confirm normal physical presentation, along with normal breathing and consciousness.

437. Plaintiff petitioned and was granted an Order to obtain MCDCC surveillance footage recordings for Pod 3900 for the thirty days preceding Mr. Mobley's death beginning February 27, 2024, through March 27, 2024.

438.    The Mecklenburg County Sheriff's Office has indicated that efforts to collect and produce MCDCC surveillance video footage recordings of Pod 3900 for the 30 days preceding Mr. Mobley's death were unsuccessful. Instead, the Mecklenburg County Sheriff's Office produced an excerpt of surveillance video footage from Pod 3900 that begins with a timestamp of 4:39:01 a.m. on March 27, 2024 and excludes the preceding hours when Mr. Mobley's medical distress began and the period when he reported his condition to Jacquez.

439.    The video surveillance footage excerpt provided to Plaintiff by Sheriff McFadden captured D.O. Jaquez at 4:39:01 a.m. on the far end of the lower level of Pod 3900, approximately two to two and a half feet in front of the doors to a janitorial closet and cells #12 and #13.

440.    The video footage then captured D.O. Jaquez walking from the furthest end of the right side of Pod 3900, starting near the janitorial closet door near cell #12.

441.    D.O. Jaquez was captured walking along a white tiled area between the red floor border demarking the edge of the pod's common room and the bank of lower cell doors that line the right wall of Pod 3900.

442.    The video footage excerpt shows D.O. Jaquez walked past cell doors #12, #13, #14, #15, #16, #17, #18, #19, #20, #21, #22, #23, and #24, until he reached for a button on the adjacent wall, which he pressed eighteen seconds later, at 4:43:19 a.m. to create a record that purports to reflect proper completion of that portion of his supervisory pod tour.

443.    The video footage excerpt captured on March 27, 2024 reflects that of

the cells D. O. Jaquez passed, Mr. Mobley's cell was the only cell in which the interior light remained on, illuminating the interior.

444. During his 18-second walk in front of cells #12 through #24, at no time did D.O. Jaquez stop, pause, or look in the windows of the thirteen cell doors as he passed.

445. The video footage captured that D.O. Jaquez walked past Mr. Mobley's cell at 04:43:08 and D.O. Jaquez did not even glance into the fully lit cell, but instead, continued his pace, looking straight ahead while walking toward the recordation button at the end of the hallway.

446. Video footage then captured D.O. Jaquez' return to his podium where he completed paperwork and electronic data entry tasks, until approximately 4:50 a.m. when he stepped away from the podium and was outside of the view of the surveillance camera. Throughout this time, Mr. Mobley's cell continued to remain fully lit from within.

447. At approximately 4:51 a.m., video footage reflects that Pod 3900 residents began exiting their cells and either descend the stairway and/or walk toward the pod's common room.

448. At approximately 4:53 a.m., fellow resident, Marquis Smith, approached Mr. Mobley's cell. With the cell still lit from within, Smith could see inside the cell through the door window and instantly began alerting another fellow resident about his observations of Mr. Mobley's condition.

449. A second resident, Columbus Washington, responded to Smith by also

looking into Mr. Mobley's lit cell, and upon observing Mr. Mobley's condition, opened the cell door and entered the cell.

450. Resident Washington exited Mr. Mobley's cell after just a few seconds and he and resident Smith began to look for and call out to D.O. Jaquez.

451. Upon information and belief, when Washington and Smith were calling out for D.O. Jaquez, he was handing out breakfast trays to residents.

452. Upon information and belief, D.O. Jaquez heard shouts and calls for help from Smith, Washington, and other Pod 3900 residents.

453. Upon information and belief, D.O. Jaquez responded to the shouts for help and alerts to the medical emergency by stating, "Hold on, I have to get these trays out."

454. Eventually, after multiple residents yelled and urged D.O. Jaquez to call for medical assistance, video footage shows that D.O. Jaquez walked to Mr. Mobley's cell and entered it at 4:55:48 a.m.

455. Seconds after entering the cell, D.O. Jaquez engaged in a heated exchange with resident Washington about Mr. Mobley's condition, and never attempted to render any immediate physical or medical aid to Mr. Mobley.

456. Thereafter, D.O. Jaquez stood in cell #17 and then paced in and out of the cell while he continued to argue with Pod 3900 residents within the common area of the pod, still rendering no aid to Mr. Mobley.

457. At approximately 4:58 a.m., Defendant Sgt. Blocker entered POD 3900 and approached D.O. Jaquez and Mr. Mobley's cell.

458.  At no time did D.O. Jaquez render medical aid to Mr. Mobley.

459.  According to MCDCC incident reports, medical agents arrived and performed CPR and employed the use of an Automatic Electronic Defibrillator (AED), to resuscitate Mr. Mobley.

460.  At approximately 5:12 a.m. paramedics arrived in Pod 3900 and removed Mr. Mobley's body from cell #17.

461.  After multiple attempts at administering life-saving aid, paramedics believed they detected a faint, irregular pulse from Mr. Mobley, though Mr. Mobley remained unconscious and unresponsive.

462.  Paramedics transported Mr. Mobley to Atrium Main Emergency Department where he was immediately intubated.

463.  Lab and neurological studies revealed that prolonged deprivation of sufficient oxygen from severely depressed respiration permanently and irreparably damaged Mr. Mobley's brain.

464.  Mr. Mobley's grave prognosis was confirmed by Atrium's medical team.

465.  Approximately twelve hours after being intubated, artificial respiration was terminated and Mr. Mobley was immediately pronounced dead.

466.  Results from Mr. Mobley's autopsy investigation confirmed that his death was caused by opiate (Fentanyl) and amphetamine (Methamphetamine) toxicity.

467.  Fentanyl is a prescription opioid commonly used as an anesthetic/analgesic. It is reported to be 80 to 200 times more potent than morphine

and is known for its rapid action onset and addictive properties. The physical presentation associated with fentanyl toxicity is not subtle, but instead it is conspicuous and includes respiratory depression, nausea, incoherence, muscle rigidity, paralysis, seizures, coma, and death.

468. Methamphetamine is a highly addictive psychostimulant drug that is a derivative of amphetamine. The physical presentation associated with methamphetamine toxicity is also conspicuous and includes respiratory depression, hot, flushed, sweaty skin, unsteady gait, rigidity, paralysis, seizures, coma, and death.

469. On March 28, 2024, following Mr. Mobley's death, D.O. Jaquez was interviewed by Special Agent Robinson of the North Carolina State Bureau of Investigation.

470. During his death in custody interview with N.C. SBI, D. O. Jaquez claimed that the first time he was aware that Mr. Mobley was not well was when other Pod 3900 residents reported concerns the morning of March 27th while Jaquez was passing out breakfast trays.

471. During his interview, D.O. Jaquez failed to disclose the statements and observations he made regarding Mr. Mobley's wellbeing, hours before, on the night of March 26, 2024.

472. Jaquez never revealed to Special Agent Robinson that Mr. Mobley required physical assistance from fellow residents to return to his cell at or around 10 p.m. the night before.

473. Jaquez never revealed to Special Agent Robinson that Mr. Mobley approached his podium and requested medical assistance the evening of March 26th and that in response to Mr. Mobley, Jaquez denied Mr. Mobley's request and ordered him to move away from his podium.

474. During his interview, Jaquez claimed that Mr. Mobley was "up and pacing" in his cell until around 3:30 a.m. when he laid down on his bed.

475. Because the surveillance footage produced by Sheriff McFadden excludes this period, claims by Jaquez regarding Mr. Mobley's presentation and behaviors at 3:30 a.m. cannot be verified.

476. Pod tour records capturing the start time, end time and completion interval for each of Jaquez' pod tours are consistent with the surveillance footage of his 4:39 a.m. pod tour on March 27th.

477. D.O. Jaquez' claims that he looked inside Mr. Mobley's cell and took the time to observe that Mr. Mobley's was moving and noted where Mr. Mobley was located and positioned within his cell are inconsistent with the records capturing the completion intervals for Jacquez' pod tours.

478. The pod tour completed by D.O. Jaquez between 3:30 a.m. and 4:00 a.m. on March 27th began at 3:37:16 and was completed at 3:40:07, a completion interval of 2 minutes and 51 seconds. This is the pod tour during which Jaquez claimed to have observed Mr. Mobley laying in his bed.

479. When residents discovered Mr. Mobley in a catatonic, unresponsive state at 4:53 a.m., he was sitting on the side of his bed, in the same position they had last seen him the night before.

480. On March 27, 2024, Mr. Mobley died as a direct and proximate result of the wrongful actions and inactions of all Defendants. His death could have been avoided by providing the lawfully required supervision, mental healthcare and the timely emergency medical care he required.

### FIRST CLAIM FOR RELIEF
**(Deliberate Indifference to Serious Medical Needs by Individual Defendants)**

481. Plaintiff incorporates the paragraphs above as if fully set forth herein.

482. Renny Mobley was a pretrial detainee while he was in custody of the Mecklenburg County Sheriff, at all times relevant to this action, from February 18, 2023 through March 12, 2024, and March 15, 2024 until March 27, 2024.

483. As a pretrial detainee at MCDCC, Mr. Mobley had substantive due process rights under the Fourteenth Amendment to be free from deliberate indifference to his serious medical needs. *See Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023).

484. At the time of his February 18, 2023, admission and throughout his detention at MCDCC, Mr. Mobley was at high risk of schizophrenic relapse and addiction relapse.

485. Detention Defendants and Medical Defendants failed to communicate timely and properly with one another regarding Mr. Mobley's serious medical

conditions and his clinical presentation and instead allowed his condition to worsen, ultimately leading to his death.

486. Acute psychosis, schizophrenic relapse and addiction relapse are serious medical conditions that can become life-threatening and cause serious physical and mental harm if not timely and properly treated.

487. At all times relevant to this action, detention supervisors Chief White, Capt. Houpe, Capt. Payne, Capt. Buchanan, Sgt. Neece, Sgt. Martinez, Sgt. Langford, Sgt. Langford, Sgt. Caver and Sgt. Blocker did not properly train or supervise D.O. Chea, D.O. Garris, D.O. Lewis, D.O. Massey and D.O. Jaquez to ensure they properly responded to the serious medical needs of Mr. Mobley while at MCDCC.

488. Detention supervisors Capt. Payne, Capt. Buchanan, Sgt. Neece, Sgt. Martinez, Sgt. Langford, Sgt. Langford, Sgt. Caver and Sgt. Blocker interacted with Mr. Mobley or reviewed interactions regarding Mr. Mobley, and none of the supervisors took any steps to refer him to the psychiatrist or to any other mental health provider.

489. At all times relevant to this action, Medical Defendants failed to recognize the need for and failed to ensure that Mr. Mobley received a proper clinical assessment and treatment when they discovered and while they were aware of his clinical condition and diagnoses.

490. Mr. Mobley's serious medical need was so obvious that even a lay person would have easily recognized that he needed medical intervention and treatment.

491. The wrongful acts and omissions of each Detention and Medical Defendants combined and cooperated with the negligence of the other defendants and caused Mr. Mobley's death.

492. Detention Defendants and Medical Defendants should have known of Mr. Mobley's serious medical need and the associated risk of death and acted accordingly. *See Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023).

## A. INDIVIDUAL DETENTION DEFENDANTS

493. MCDCC Detention staff have been trained or should have been trained to properly recognize and identify residents presenting with symptoms of mental health or medical needs.

494. Detention Defendants directly observed Mr. Mobley on numerous occasions and were regularly reporting or receiving detailed information about Mr. Mobley's symptoms, presentation, and confinement.

495. Based upon their observations and knowledge of Mr. Mobley, Detention Defendants recognized or should have recognized that Mr. Mobley exhibited symptoms of mental illness and medical need.

496. Detention Defendants failed to properly act and intervene to provide Mr. Mobley with mental health care and medical care and instead they repeatedly denied the requisite care and locked Mr. Mobley in solitary confinement or segregation (lockdown).

497. Detention Defendants knew that Mr. Mobley's mental health and medical conditions required medical intervention and that failing to intervene and

ensure medical treatment was provided would result in risks of serious harm to Mr. Mobley.

498.    Detention Defendants D.O. Jaquez, Sgt. Blocker and Capt. Houpe knew that Mr. Mobley required emergency aid and they not only failed to render emergency aid, but they also failed to secure timely medical treatment for Mr. Mobley's emergency medical needs that began on March 26, 2024.

499.    Detention Defendants each purposefully failed to respond to Mr. Mobley's serious medical needs despite actual knowledge of the risks of harm or even though an objectively reasonable person under the circumstances would have appreciated the risks involved. *See Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023).

500.    Detention Defendants each consciously or recklessly disregarded the substantial risks of serious harm to Mr. Mobley by not contacting a mental health care provider or emergency medical services to provide medical attention and treatment for Mr. Mobley before 4:56 a.m. on March 27, 2024.

501.    Detention Defendants were acting under the color of state law during their interactions with Mr. Mobley at MCDCC.

502.    Detention Defendants acted with deliberate indifference to the serious medical needs of Mr. Mobley.

503.    Detention Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Mobley's substantive due process rights.

**B.    INDIVIDUAL MEDICAL DEFENDANTS**

504. All Medical Defendants, except for Defendants Sanchez, Squibb, Noltemeyer, and Atabong, directly observed Mr. Mobley on numerous occasions, throughout his detention and all Medical Defendants were regularly reporting or receiving information about Mr. Mobley's symptoms, presentation and confinement.

505. Medical Defendants were each aware or strongly suspected that Mr. Mobley had serious medical needs.

506. Medical Defendants each knew that Mr. Mobley's mental health and medical conditions required medical attention and that substantial risks of serious harm existed to Mr. Mobley if his conditions were not treated.

507. Medical Defendants each purposefully failed to respond to Mr. Mobley's serious medical needs despite actual knowledge of the risks of harm or even though an objectively reasonable person under the circumstances would have appreciated the risks involved.

**PA Sanchez, NP Squibb, NP Noltemeyer, and NP Atabong**

508. **Defendants PA Sanchez, NP Squibb, NP Noltemeyer, and NP Atabong** each consciously or recklessly disregarded the substantial risks of serious harm to Mr. Mobley by:

    a. failing to obtain or require medical staff to obtain Mr. Mobley's prior mental health records, including his most current medication regimen, especially given his known diagnoses in MCDCC records, in violation of MCSO Policy and Procedure;

    b. failing to refer him for a mental health evaluation and treatment by a psychiatric provider;

    c. failing to classify Mr. Mobley's need for evaluation by a psychiatric provider as urgent instead of routine;

d.  failing to bridge Mr. Mobley's community-based medication regimen in violation of MCSO Policy and Procedure;

e.  failing to examine, evaluate or speak to Mr. Mobley before issuing prescriptions for medications that his medical records documented as previously discontinued due to inefficacy and risk in the treatment of his disease;

f.  failing to investigate his symptoms and the basis associated with Mr. Mobley being locked in solitary confinement or segregated;

g.  failing to timely initiate proper medications, in the proper dosage;

h.  failing to label risperidone as a high priority medication for treatment of his serious mental health conditions;

i.  failing to document the clinical basis to institute an alternate treatment plan for his mental health conditions, in violation of MCSO Policy and Procedure;

j.  failing to follow through to determine the efficacy of prescribed medications and ensure he was properly treated;

k.  failing to respond to Mr. Mobley's documented pattern of refusing the prescribed medications, in violation of MCSO Policy and Procedure;

l.  otherwise neglecting Mr. Mobley and failing to treat his mental health and medical conditions; and

m.  in such further ways as may be shown by the evidence.

509.  The prescribing care provided by PA Sanchez, NP Squibb, NP Noltemeyer, and NP Atabong was a gross violation of the accepted standards of practice and so grossly incompetent and inadequate as to shock the conscience and violate fundamental fairness.

507.  PA Sanchez, NP Squibb, NP Noltemeyer, and NP Atabong were acting under the color of state law when they prescribed medications to Mr. Mobley at MCDCC.

508. PA Sanchez, NP Squibb, NP Noltemeyer, and NP Atabong acted with deliberate indifference to the serious medical needs of Mr. Mobley.

509. PA Sanchez, NP Squibb, NP Noltemeyer, and NP Atabong are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Mobley's substantive due process rights.

**Dr. Le-Bliss**

510. **Defendant Dr. Le-Bliss** consciously or recklessly disregarded the substantial risks of serious harm to Mr. Mobley by:

   a. failing to obtain or require medical staff to obtain Mr. Mobley's prior mental health records, including his most current medication regimen, especially given his known diagnoses in MCDCC records, in violation of MCSO Policy and Procedure;

   b. failing to bridge Mr. Mobley's community-based medication regimen in violation of MCSO Policy and Procedure;

   c. failing to examine, evaluate or speak to Mr. Mobley concerning his psychiatric medications or refer him to a psychiatric provider for the same, when his MCDCC medical records indicated MCDCC prescribers issued prescription medications that his medical records documented to have been previously discontinued due to inefficacy and risk in the treatment of his disease;

   d. failing to refer Mr. Mobley to an endocrinologist, given his unstable thyroid levels;

   e. failing to recognize his diagnosis of hyperthyroidism exacerbates his mental health symptoms;

   f. failing to investigate the symptoms and basis associated with Mr. Mobley being locked in solitary confinement or segregated;

   g. failing to label risperidone as a high priority medication for treatment of serious mental health conditions;

h.  failing to question the undocumented clinical basis to institute an alternate treatment plan for Mr. Mobley's mental health condition, in violation of MCSO policy and procedure;

i.  failing to follow through to determine and ensure the efficacy of prescribed medications;

j.  failing to respond to and intervene on missed prescribed medications;

k.  otherwise neglecting Mr. Mobley and failing to treat his mental health and medical conditions; and

l.  in such further ways as may be shown by the evidence.

511. The medical care provided by Dr. Le-Bliss was a gross violation of the accepted standards of practice and so grossly incompetent and inadequate as to shock the conscience and violate fundamental fairness.

512. Dr. Le-Bliss was acting under the color of state law when she provided medical care to Mr. Mobley at MCDCC.

513. Dr. Le-Bliss acted with deliberate indifference to the serious medical needs of Mr. Mobley.

514. Dr. Le-Bliss is liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Mobley's substantive due process rights.

**Defendants RN Fair, RN Thompson and RN Williams**

515. **Defendants RN Fair, RN Thompson and RN Williams** each consciously or recklessly disregarded the substantial risks of serious harm to Mr. Mobley by:

a.  failing to obtain or require medical staff to obtain Mr. Mobley's prior mental health records, including his most current medication regimen, especially given his known diagnoses in MCDCC records, in violation of MCSO Policy and Procedure;

b. failing to examine or evaluate Mr. Mobley or to review his medical history and consider his symptoms of acute mania, his psychotic symptoms, and act of self-medicating before deeming him medically eligible for solitary confinement;

c. failing to investigate Mr. Mobley's coinciding symptom presentation and the circumstances causing Detention Defendants to request medical clearance to lock Mr. Mobley in solitary confinement before deeming him medically eligible, to be locked in solitary confinement;

d. failing to document the steps completed and the basis used to determine that Mr. Mobley was medically eligible to be locked in solitary confinement, given his serious medical needs, in violation of MCSO Policy and Procedure;

e. failing to refer Mr. Mobley for examination and treatment by a psychiatric provider;

f. failing to take steps to inquire about or ensure the efficacy of Mr. Mobley's prescription medications;

g. failing to label and/or recognize risperidone as a High Priority medication for treatment of his serious mental health conditions;

h. failing to respond to and intervene on missed prescribed medications, in violation of MCSO Policy and Procedure;

i. otherwise neglecting Mr. Mobley and failing to treat his mental health and medical conditions; and

j. in such further ways as may be shown by the evidence.

516. The medical care provided by RN Fair, RN Thompson and RN Williams was a gross violation of the accepted standards of practice and so grossly incompetent and inadequate as to shock the conscience and violate fundamental fairness.

517. RN Fair, RN Thompson and RN Williams were acting under the color of state law when they provided medical care to Mr. Mobley at MCDCC.

518. RN Fair, RN Thompson and RN Williams acted with deliberate indifference to the serious medical needs of Mr. Mobley.

519. RN Fair, RN Thompson and RN Williams are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Mobley's substantive due process rights.

**Cierra Mercado, LCSWA and Doe 1 through Doe 8**

520. **Defendant Cierra Mercado, LCSWA and Doe 1 through Doe 8** consciously or recklessly disregarded the substantial risks of serious harm to Mr. Mobley by:

    a. failing to obtain or require medical staff to obtain Mr. Mobley's prior mental health records, including his most current medication regimen, especially given his known diagnoses in MCDCC records, in violation of MCSO Policy and Procedure;

    b. failing to examine or evaluate Mr. Mobley or to review his medical history and consider his symptoms of acute mania, his psychotic symptoms, and his acts self-medicating;

    c. failing to investigate Mr. Mobley's coinciding symptom presentation following Detention Defendants locking Mr. Mobley in solitary confinement;

    d. failing to review Mr. Mobley's medical and mental health history before or after visiting him while he was locked in solitary confinement;

    e. failing to investigate the basis for Detention Defendants locking Mr. Mobley in solitary confinement;

    f. failing to refer him for a mental health evaluation and treatment by a psychiatric provider and documenting such referral as urgent;

    g. failing to accurately record the status of Mr. Mobley's mental health prescription medications and erroneously documenting that he was properly medicated;

h. failing to question the undocumented clinical basis to institute an alternate treatment plan for Mr. Mobley's mental health condition, in violation of MCSO Policy and Procedure;

i. otherwise neglecting Mr. Mobley and failing to treat or ensure treatment of his mental health conditions or advocating for him in any way; and

j. in such further ways as may be shown by the evidence.

521. The medical care provided by Cierra Mercado, LCSW and Doe 1 through Doe 8 was a gross violation of the accepted standards of practice and so grossly incompetent and inadequate as to shock the conscience and violate fundamental fairness.

522. Cierra Mercado, LCSWA Doe 1 through Doe 8 were acting under the color of state law when they provided medical care to Mr. Mobley at MCDCC.

523. Cierra Mercado, LCSWA and Doe 1 through Doe 8 acted with deliberate indifference to the serious medical needs of Mr. Mobley.

524. Cierra Mercado, LCSWA and Doe 1 through Doe 8 are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Mobley's substantive due process rights.

**Remaining Medical Defendants**

525. The remaining Medical Defendants, Josephine Bashaka, MA, Tadashia Brice, MA, Christi Eden, MA, Shavonne Ellis, MA, Valerie Gilbert, LPN, Gilda Louallen, MA, Brittany Moore, LPN, Judith Mortel, LPN, Tiana Motley, LPN, Tiarra Slade, LPN, Shanta Smith, MA, Aaliyyah Terry Green, LPN, Dollie Wasson, LPN,

and Dwayne Williamson, LPN each consciously or recklessly disregarded the substantial risks of serious harm to Mr. Mobley by:

a. failing to obtain or require medical staff to obtain Mr. Mobley's prior mental health records, including his most current medication regimen, especially given his known diagnoses in MCDCC records, in violation of MCSO Policy and Procedure;

b. failing to examine, evaluate, or speak to Mr. Mobley after he allegedly refused to take the prescription medications purported to treat his mental health diagnoses;

c. failing to investigate or evaluate Mr. Mobley's coinciding symptom presentation following Detention Defendants locking Mr. Mobley in solitary confinement;

d. failing to review Mr. Mobley's medical and mental health history before or after providing him with medications;

e. failing to investigate the basis for Detention Defendants locking Mr. Mobley in solitary confinement or segregation;

f. failing to refer him for a mental health evaluation and treatment by a psychiatric provider;

g. failing to provide medications for Mr. Mobley within an hour of 10:00 and 22:00, in violation of MCSO Policy and Procedure;

h. failing to recognize risperidone was a high priority medication;

i. failing to notify the respective prescriber each time Mr. Mobley refused (missed) risperidone dosage, in violation of MCSO Policy and Procedure;

j. failing to respond to and intervene on missed prescription medication;

k. failing to address Mr. Mobley's pattern of alleged prescription medication refusals, in violation of MCSO Policy and Procedure;

l. otherwise neglecting Mr. Mobley and failing to treat his mental health and medical conditions; and

m. in such further ways as may be shown by the evidence.

526. The medical care provided by the remaining Medical Defendants named above was a gross violation of the accepted standards of practice and so grossly incompetent and inadequate as to shock the conscience and violate fundamental fairness.

527. The remaining Medical Defendants named above were acting under the color of state law when they provided medical care to Mr. Mobley at MCDCC.

528. The remaining Medical Defendants named above acted with deliberate indifference to the serious medical needs of Mr. Mobley.

529. The remaining Medical Defendants named above are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Mobley's substantive due process rights.

## SECOND CLAIM FOR RELIEF
**(Policy or Custom of Deliberate Indifference by Defendants Mecklenburg County, Sheriff McFadden, Dr. Biondi and Reserve Health)**

530. Plaintiff incorporates the paragraphs above as if fully set forth herein.

531. At the time of the events in this case, Mecklenburg County and Sheriff McFadden had an agreement with Wellpath, LLC who had an agreement with Reserve Health to provide medical care to residents and detainees at MCDCC. Under Reserve Health's agreement, Reserve Health was only required to have the Medical Director, Dr. Biondi, present one day per week at MCDCC

532. In addition, Mecklenburg County Sheriff's Office had Policies and Procedures for MCDCC that were reviewed and approved by the County in

consultation with Wellpath, LLC, Reserve Health and Dr. Biondi and Sheriff McFadden.

533. On or before March 27, 2024, Mecklenburg County, Sheriff McFadden, Dr. Biondi and Reserve Health knew that:

a. a significant percentage of the MCDCC resident population suffered severe mental health disorders and drug or alcohol addiction;

b. MCDCC residents suffering from severe mental health disorders and drug or alcohol addiction required medical and mental health care and treatment, including emergency care;

c. despite knowing the significant medical and mental health demands of the MCDCC resident population, Reserve Health failed to employ an onsite or fulltime psychiatrist and opted instead to address the complex and vast mental health needs of the MCDCC resident population with only videoconference-based care, with a facility cap of five hours per week;

d. under MCSO Policy and Procedure, MCDCC medical staff was mandated to bridge the medical care MCDCC residents were receiving in the community, prior to admission;

e. the MCDCC Medical Director from Reserve Health, Dr. Biondi, only attended the MCDCC medical clinic, in person, once per week, yet routinely made medical decisions and instituted treatment for residents without physically examining them or personally evaluating them;

f. MCDCC failed to provide or ensure sufficient medical staffing, supervision, and resources to treat, monitor and care for residents with severe mental health disorders and drug or alcohol addiction;

g. residents suffering from drug or alcohol addiction and/or severe mental health disorders are likely to seek illicit drugs to self-medicate;

h. Sheriff McFadden's security policy failed to require that all who enter MCDCC first successfully pass security clearance by submitting to the facility's full-body scanner;

i. Sheriff McFadden's security policy only required that arrestees or residents submit to the facility's full-body scanner, allowing his

employees, staff and agents to by-pass the security clearance before entering the facility;

j. illicit drugs and contraband detected on arrestees or residents by the facility's full-body scanner were seized and collected by Sheriff McFadden's employees;

k. Sheriff McFadden, his employees, staff and agents were aware that illicit drugs were present within MCDCC and readily available to MCDCC residents;

l. Sheriff McFadden failed to ensure facility safety through the use of "Man-Down" drills, as defined by NCCHC, requiring detention staff and medical staff to perform practice drills to be properly prepared for emergencies, including medical emergencies;

m. without first ensuring that they received proper assessments and monitoring from a qualified medical provider, Defendant McFadden confined residents who were suffering from severe mental health disorders to a single cell and only provided emergency medical care to them when/if an imminent threat to life/ of death was detected;

n. the following people died while residing at MCDCC while they were under the exclusive care, custody, control and safekeeping of Defendant McFadden, his detention staff and/or MCDCC medical staff. Their deaths resulted from McFadden and MCDCC staff repeatedly failing to properly monitor and supervise the residents, improper training and supervision of the MCDCC supervisors and detention officers, repeated failure to comply with North Carolina statutes and/or administrative codes and/or NCCHC standards, and failure to provide adequate general or emergency medical or mental healthcare for MCDCC residents including:

*George Benfield*
*Kenneth Bingham*
*Russell Fincham*
*Derrick Geter*
*Karon Golightly*
*Karla Griffin*
*John Devin Haley*
*Elijah Kelly*
*Francine Laney*
*Michael Mangan*
*Jemarcus McIlwaine*

*Bryon Miller*
*William Rhinesmith*
*Jerome Thompson*
*Michael Trent*
*Desmond Whisnant*

o. the Mecklenburg County Sheriff's Department and Defendant McFadden have been previously cited by North Carolina Department of Health and Human Services on multiple occasions for failure to provide supervisory rounds, as required under North Carolina law;

p. adequate supervisory rounds wherein the detention officer or supervisor actually observe each resident and visually determine that each MCDCC resident is free from any symptoms or indications that the resident is suffering from any medical or mental health distress is critical for residents suffering from serious medical conditions but were routinely not done properly;

q. detention staff, such as Defendant Jaquez, were not properly trained and/or properly supervised to provide adequate supervisory rounds, even when the resident expressed or complained of serious medical need; and

r. detention supervisors failed to audit supervisory rounds to ensure detention officers were doing them properly and thus failed to correct or penalize detention officers when not doing them properly.

## A.   MECKLENBURG COUNTY

534.   Mecklenburg County knew that the agreement with Wellpath, LLC and Reserve Health did not ensure that MCDCC residents with serious medical needs would receive adequate medical care and supervision.

535.   Upon information and belief, Mecklenburg County was aware of Sheriff McFadden's practice or unofficial policy of placing residents with severe mental health disorders into MCDCC's general population and into single cells.

536.   Mecklenburg County approved or condoned these policies or customs and failed to institute a Medical Plan that provided adequate medical care, medical

supervision, and emergency medical services for MCDCC residents with severe mental health disorders and needs.

537.    Through its approval of the policies or customs at MCDCC, the inadequate Medical Plan, and the contractual relationship with Wellpath, LLC and Reserve Health, Mecklenburg County had an official policy or custom of deliberate indifference to the serious medical needs of MCDCC residents, like Renny Mobley, who suffered with severe mental health disorders.

538.    Mecklenburg County's official policy or custom was a cause of, and the moving force behind, the violation of Mr. Mobley's right to be free from deliberate indifference to his serious medical needs.

539.    Mecklenburg County is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused the violation of Mr. Mobley's substantive due process rights at MCDCC.

### B.    DEFENDANTS SHERIFF MCFADDEN AND DR. BIONDI

540.    Sheriff McFadden and Dr. Biondi approved the Medical Plan and the unwritten policy or custom to admit and house residents with severe mental health disorders knowing that they would not receive adequate medical care and would not be properly monitored or supervised.

541.    Sheriff McFadden's official policies or customs were inadequate because they did not provide appropriate supervision or adequate medical care to residents with serious medical needs from severe mental health disorders.

542. In addition, on or before March 27, 2024, Sheriff McFadden and Dr. Biondi knew that:

    a. due to the significant percentage of MCDCC residents suffering from severe mental health and addiction disorders, in-service training for all staff was necessary to successfully detect and manage medical and mental health emergencies;

    b. MCDCC detention staff was inadequately trained on the successful detection of and intervention on medical and mental health emergencies ranging from drug toxicity to overdose;

    c. the medical staff and detention staff were inadequately trained on and/or did not follow MCSO Policy and Procedure regarding medication bridging, medication delivery, medication refusal documentation, the proper clinical actions in response to medication refusals, and the proper medical screening and documentation required to deem a resident medically eligible for solitary confinement;

    d. there was no consequence when medical or detention staff failed to follow MCSO Policy and Procedure for medication bridging, medication delivery, medication refusal documentation. Similarly, there was no consequence when staff failed properly respond to medication refusals, or to adhere to proper medical screening and the medical documentation required to deem a resident medically eligible for solitary confinement, ratifying the unspoken policy of deliberate indifference to the serious medical needs of MCDCC residents;

    e. the discretion whether to obtain medical treatment for a resident suffering with severe mental health disorders and/or drug intoxication was left with inadequately trained detention officers and unsupervised medical staff;

    f. residents who presented with symptoms indicating serious mental illness did not receive proper supervision and observation from detention officers and were inadequately cared for by the medical staff;

    g. Sheriff McFadden had a non-delegable duty to provide emergency medical care to residents with serious medical needs;

    h. Sheriff McFadden delegated the responsibility to Wellpath, LLC and Reserve Health to provide emergency medical care to residents but failed to properly and adequately train detention and medical staff

through the use of "man down" drills to ensure they were prepared to properly respond to medical emergencies;

i. detention staff, such as Defendant Jaquez, were not properly or sufficiently trained or supervised to adequately monitor residents with serious medical needs such as Mr. Mobley;

j. detention staff, such as Defendant Jaquez, were not properly trained or sufficiently supervised to correctly respond to resident health complaints and symptoms indicating serious medical need;

k. detention staff, such as Defendant Jaquez, were not properly trained or adequately supervised to document resident complaints about and evidence of serious medical need; and

l. detention staff, such as Defendant Jaquez, were not trained or required to properly respond to medical emergencies that require rendering cardiopulmonary resuscitation (CPR) by mandating that they render CPR to residents in need of it.

543. Sheriff McFadden and Dr. Biondi failed to provide adequate training to MCDCC detention officers and medical staff, respectively, on detecting and properly responding to medical and mental health emergencies related to severe mental health disorders and/ or severe drug intoxication.

544. Sheriff McFadden and Dr. Biondi knew that MCDCC detention officers and medical staff were responsible for the care of residents with serious medical needs, including severe mental health disorders and drug or alcohol intoxication. Because of inadequate training, insufficient staffing and supervision and deficient adherence to policies, MCDCC detention officers and medical staff regularly and routinely failed to provide adequate medical care to MCDCC residents suffering from severe mental health disorders, in violation of their substantive due process rights.

545. The collective failures of Sheriff McFadden and Dr. Biondi to provide adequate training, staffing and supervision for the detention and medical staff showed a deliberate indifference to the rights of MCDCC residents, including Mr. Mobley.

546. Sheriff McFadden and Dr. Biondi had official policies and/or customs evidencing deliberate indifference to the serious medical needs of residents, like Mr. Mobley, who suffered from severe mental health disorders and drug intoxication.

547. Detention Defendants acted in accordance with Sheriff McFadden's policies or customs through their deliberate indifference to the serious medical needs of Mr. Mobley from February 18, 2023, until his death on Mach 27, 2024.

548. Medical Defendants acted in accordance with the policies or customs of both Sheriff McFadden and Dr. Biondi through their deliberate indifference to the serious medical needs of Mr. Mobley from February 18, 2023, until his death on March 27, 2024.

549. Sheriff McFadden and Dr. Biondi condoned the decisions by MCDCC detention staff and medical staff respectively, to place Mr. Mobley in general population without treating his mental health and addiction disorders, allowing his serious mental health conditions to be improperly and insufficiently supervised and/or monitored, ignoring and disregarding his missed prescription medication doses, allowing his symptoms to addressed with punishment rather than treatment by permitting detention and medical staff to repeatedly lock Mr. Mobley in solitary confinement or segregation.

550.    Sheriff McFadden and Dr. Biondi's official policies and/or customs were a cause of, and the moving force behind, the violation of Mr. Mobley's right to be free from deliberate indifference to his serious medical needs.

551.    Sheriff McFadden and Dr. Biondi are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policies or customs which caused the violation of Mr. Mobley's substantive due process rights at MCDCC.

## C.    RESERVE HEALTH

552.    Dr. Biondi approved Sheriff McFadden's policy or custom of allowing insufficiently trained individuals to determine whether MCDCC residents were permitted to receive emergency medical services.

553.    Reserve Health, through Dr. Biondi, and from prior civil actions, knew that Sheriff McFadden's policies and customs failed to provide adequate medical care to MCDCC residents suffering from severe mental health disorders with serious medical needs.

554.    Reserve Health, through Dr. Biondi, and from prior civil actions, knew that Sheriff McFadden did not follow nor did he enforce MCSO policy and procedure regarding medication bridging, medication delivery, medication refusal documentation, the required response action to  missed medication/medication refusals, and the medical screening and documentation required to deem a resident medically eligible to be locked in solitary confinement.

555.    In addition, on or before March 27, 2024, Reserve Health failed to provide adequate medical and mental health staffing at MCDCC and failed to provide

adequate training and supervision of the medical staff assigned to care for residents suffering from severe mental health disorders or medical and mental health emergencies.

556. Reserve Health knew that the nursing staff and detention staff at MCDCC were responsible for the care of residents with serious medical needs including those suffering from severe mental health disorders and drug or alcohol intoxication. Because of inadequate training, insufficient supervision and deficient policies, MCDCC residents suffering from severe mental health disorders regularly and routinely failed to receive adequate medical care in violation of their substantive due process rights.

557. For Reserve Health to knowingly fail to provide adequate staffing, supervision and training showed deliberate indifference to the rights of MCDCC residents, including Mr. Mobley.

558. Reserve Health instituted official policies or customs of deliberate indifference to the serious medical needs of residents suffering from severe mental health disorders, like Mr. Mobley.

559. Reserve Health instituted official policies or customs of deliberate indifference to the serious medical needs of residents suffering from severe drug intoxication, like Mr. Mobley.

560. Dr. Biondi acted in accordance with the policies and customs of Reserve Health through his deliberate indifference to the serious medical needs of Mr. Mobley.

561. The official policies or customs instituted by Reserve Health were a cause of, and the moving force behind, the violation of Mr. Mobley's right to be free from deliberate indifference to his serious medical needs.

562. Reserve Health is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused the violation of Mr. Mobley's substantive due process rights at MCDCC.

**THIRD CLAIM FOR RELIEF**
**(Action on Official Bond Against Defendants Sheriff McFadden and Ohio Casualty)**

563. Plaintiff incorporates the paragraphs above as if fully set forth herein.

564. Sheriff McFadden procured an official bond as principal from Ohio Casualty in the sum of $25,000 and such bond was in effect at all relevant times to this action.

565. Ohio Casualty joined with Sheriff McFadden as surety in the execution of the official bond and thereby undertook to be jointly and severally liable for the failure for Sheriff McFadden and his detention officers to faithfully perform the duties of his office as Sheriff of Mecklenburg County.

566. The Detention Defendants were acting within the course and scope of their employment as Mecklenburg County detention officers and under color of state law under Sheriff McFadden's office during their interactions with Mr. Mobley on February 18, 2023 through March 27, 2024.

567. The acts and omissions of the Detention Defendants, as alleged in this action and imputed to Sheriff McFadden under the doctrine of *Respondeat Superior*,

constituted neglect, misconduct, misbehavior and/or a breach of their official duties as detention officers.

568. Sheriff McFadden and Ohio Casualty are jointly and severally liable to Plaintiff, pursuant to N.C. Gen. Stat. § 58-76-5, for Mr. Mobley's personal injuries and wrongful death to the extent of the official bond.

**FOURTH CLAIM FOR RELIEF**
**(Medical Malpractice by Medical Defendants)**

569. Plaintiff incorporates the paragraphs above as if fully set forth herein.

570. During their care of Mr. Mobley, Medical Defendants had a duty to use their best judgment, to use reasonable care and diligence in the application of their knowledge and skill to Mr. Mobley's care, and to provide health care in accordance with the standards of practice among like licensed providers with similar training and experience in the same or similar communities.

A. **DEFENDANTS PA SANCHEZ, NP SQUIBB, NP NOLTEMEYER, AND NP ATABONG**

571. At a minimum, Defendants **PA Sanchez, NP Squibb, NP Noltemeyer, and NP Atabong** were negligent and breached their duty of care to Mr. Mobley by failing to use their best judgment, failing to use reasonable care and diligence in the application of their knowledge and skill to Mr. Mobley's care, and failing to provide health care in accordance with the standards of practice among like licensed practitioners with similar training and experience in the same or similar communities, including by:

a. failing to obtain or require medical staff to obtain Mr. Mobley's prior mental health records, including his most current medication regimen, especially given his known diagnoses in MCDCC records, in violation of MCSO Policy and Procedure;

b. failing to classify Mr. Mobley's need for evaluation by a psychiatric provider as urgent instead of routine;

c. failing to bridge Mr. Mobley's community-based medication regimen, in violation of MCSO Policy and Procedure;

d. failing to examine, evaluate or speak to Mr. Mobley before issuing prescriptions for medications that his medical records documented as previously discontinued due to inefficacy and risk in the treatment of his disease;

e. failing to investigate his symptoms and the basis associated with Mr. Mobley being locked in solitary confinement or segregated;

f. failing to refer him for a mental health evaluation and treatment with a psychiatric provider;

g. failing to timely initiate proper medications, in the proper dosage for Mr. Mobley;

h. failing to label Risperidone as a high priority medication for treatment of his serious mental health conditions;

i. failing to document the clinical basis to institute an alternate treatment plan for his mental health conditions, in violation of MCSO Policy and Procedure;

j. failing to follow through to determine the efficacy of prescribed medications and ensure he was properly treated;

k. failing to respond to Mr. Mobley's documented pattern of refusing the prescribed medications, in violation of MCSO Policy and Procedure;

l. otherwise neglecting Mr. Mobley and failing to treat his mental health and medical conditions; and

m. in such further ways as may be shown by the evidence.

572.     Defendants **PA Sanchez, NP Squibb, NP Noltemeyer, and NP Atabong** were grossly negligent in their care of Mr. Mobley because their actions:

   a.  lacked even slight care;

   b.  showed indifference to the rights and welfare of his person;

   c.  were of an aggravated character;

   d.  were committed in reckless disregard for the rights and safety of Mr. Mobley;

   e.  intentionally failed to comply with her/her duties as a physician assistant or nurse practitioner; and

   f.  in such further ways as may be shown by the evidence.

**B.     DEFENDANT DR. LE-BLISS**

573.     Dr. Le-Bliss was negligent and breached her duty of care to Mr. Mobley by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. Mobley's care, and failing to provide health care in accordance with the standards of practice among physicians with similar training and experience in the same or similar communities, including by:

   a.  failing to obtain or require medical staff to obtain Mr. Mobley's prior mental health records, including his most current medication regimen, especially given his known diagnoses in MCDCC records, in violation of MCSO Policy and Procedure;

   b.  failing to bridge Mr. Mobley's community-based medication regimen in violation of MCSO Policy and Procedure;

   c.  failing to examine, evaluate or speak to Mr. Mobley concerning his psychiatric medications or refer him to a psychiatric provider for the same, when his MCDCC medical records indicated MCDCC prescribers issued prescription medications that his medical records documented to have been previously discontinued due to inefficacy and risk in the treatment of his disease;

   d. failing to refer Mr. Mobley to an endocrinologist, given his unstable thyroid levels;

   e. failing to recognize his diagnosis of hyperthyroidism exacerbated his mental health symptoms;

   f. failing to investigate the symptoms and basis associated with Mr. Mobley being locked in solitary confinement or segregation;

   g. failing to label risperidone as a high priority medication for treatment of serious mental health conditions;

   h. failing to question the undocumented clinical basis to institute an alternate treatment plan for Mr. Mobley's mental health condition, in violation of MCSO Policy and Procedure;

   i. failing to follow through to determine and ensure the efficacy of prescribed medications;

   j. failing to respond to and intervene on missed prescribed medications;

   k. otherwise neglecting Mr. Mobley and failing to treat his mental health and medical conditions; and

   l. in such further ways as may be shown by the evidence.

574. Dr. Le-Bliss was grossly negligent in her care of Mr. Mobley because her actions:

   a. lacked even slight care;

   b. showed indifference to the rights and welfare of his person;

   c. were of an aggravated character; were committed in reckless disregard for the rights and safety of Mr. Mobley;

   d. intentionally failed to comply with her duties as a physician; and

   e. in such further ways as may be shown by the evidence.

**C. DEFENDANTS RN FAIR, RN THOMPSON AND RN WILLIAMS**

575. At a minimum, **Defendants RN Fair, RN Thompson and RN Williams** were negligent and breached their duty of care to Mr. Mobley by failing to use their best judgment, failing to use reasonable care and diligence in the application of their knowledge and skill to Mr. Mobley's care, and failing to provide health care in accordance with the standards of practice among registered nurses with similar training and experience in the same or similar communities, including by:

   a. failing to obtain or require medical staff to obtain Mr. Mobley's prior mental health records, including his most current medication regimen, especially given his known diagnoses in MCDCC records, in violation of MCSO Policy and Procedure;

   b. failing to examine or evaluate Mr. Mobley or to review his medical history and consider his symptoms of acute mania, his psychotic symptoms, and act of self-medicating before deeming him medically eligible for solitary confinement;

   c. failing to investigate Mr. Mobley's coinciding symptom presentation and the circumstances causing Detention Defendants to request medical clearance to lock Mr. Mobley in solitary confinement before deeming him medically eligible, to be locked in solitary confinement;

   d. failing to document the steps completed and the basis used to determine that Mr. Mobley was medically eligible to be locked in solitary confinement, given his serious medical needs, in violation of MCSO Policy and Procedure;

   e. failing to refer Mr. Mobley for examination and treatment by a psychiatric provider;

   f. failing to take steps to inquire about or ensure the efficacy of Mr. Mobley's prescription medications;

   g. failing to label and/or recognize risperidone as a High Priority medication for treatment of his serious mental health conditions;

   h. failing to respond to and intervene on missed prescribed medications, in violation of MCSO Policy and Procedure;

    i.    otherwise neglecting Mr. Mobley and failing to treat his mental health and medical conditions; and

    j.    in such further ways as may be shown by the evidence.

576.  **RN Fair, RN Thompson and RN Williams** were grossly negligent in their care of Mr. Mobley because their actions:

    a.    lacked even slight care;

    b.    showed indifference to the rights and welfare of his person;

    c.    were of an aggravated character; were committed in reckless disregard for the rights and safety of Mr. Mobley;

    d.    intentionally failed to comply with her duties as a registered nurse; and

    e.    in such further ways as may be shown by the evidence.

## D.    DEFENDANT CIERRA MERCADO, LCSWA AND DOE 1 THROUGH DOE 8

577. At a minimum Defendant Mercado, LCSWA and Doe 1 through Doe 8 were negligent and breached their duty of care to Mr. Mobley by failing to use their best judgment, failing to use reasonable care and diligence in the application of their knowledge and skill to Mr. Mobley's care, and failing to provide mental health care in accordance with the standards of practice among similarly licensed clinicians with similar training and experience in the same or similar communities, including by:

    a.    failing to obtain or require medical staff to obtain Mr. Mobley's prior mental health records, including his most current medication regimen, especially given his known diagnoses in MCDCC records, in violation of MCSO Policy and Procedure;

    b.    failing to examine or evaluate Mr. Mobley or to review his medical history and consider his symptoms of acute mania, his psychotic symptoms, and his acts self-medicating;

c. failing to investigate Mr. Mobley's coinciding symptom presentation following Detention Defendants locking Mr. Mobley in solitary confinement or segregation;

d. failing to review Mr. Mobley's medical and mental health history before or after visiting him while he was locked in solitary confinement;

e. failing to investigate the basis for Detention Defendants locking Mr. Mobley in solitary confinement;

f. failing to refer him for a mental health evaluation and treatment by a psychiatric provider and documenting such referral as urgent;

g. failing to accurately record the status of Mr. Mobley's mental health prescription medications and erroneously documenting that he was properly medicated;

h. failing to question the undocumented clinical basis to institute an alternate treatment plan for Mr. Mobley's mental health condition, in violation of MCSO Policy and Procedure;

i. otherwise neglecting Mr. Mobley and failing to treat or ensure treatment of his mental health conditions or advocating for him in any way; and

j. in such further ways as may be shown by the evidence.

578. Defendant Mercado and Doe 1 through Doe 8 were grossly negligent in their care of Mr. Mobley because their actions:

a. lacked even slight care;

b. showed indifference to the rights and welfare of his person;

c. were of an aggravated character;

d. were committed in reckless disregard for the rights and safety of Mr. Mobley;

e. intentionally failed to comply with their duties as licensed clinicians; and

f. in such further ways as may be shown by the evidence.

## E. REMAINING MEDICAL DEFENDANTS

579. At a minimum Defendants Josephine Bashaka, MA, Tadashia Brice, MA, Christi Eden, MA, Shavonne Ellis, MA, Valerie Gilbert, LPN, Gilda Louallen, MA, Brittany Moore, LPN, Judith Mortel, LPN, Tiana Motley, LPN, Tiarra Slade, LPN, Shanta Smith, MA, Aaliyyah Terry Green, LPN, Dollie Wasson, LPN, and Dwayne Williamson, LPN were negligent and breached their duty of care to Mr. Mobley by failing to use their best judgment, failing to use reasonable care and diligence in the application of their knowledge and skill to Mr. Mobley's care, and failing to provide health care in accordance with the standards of practice among like licensed practitioners with similar training and experience in the same or similar communities, including by:

    a. failing to obtain or require medical staff to obtain Mr. Mobley's prior mental health records, including his most current medication regimen, especially given his known diagnoses in MCDCC records, in violation of MCSO Policy and Procedure;

    b. failing to examine, evaluate, or speak to Mr. Mobley after he allegedly refused to take the prescription medications purported to treat his mental health diagnoses;

    c. failing to investigate or evaluate Mr. Mobley's coinciding symptom presentation following Detention Defendants locking Mr. Mobley in solitary confinement;

    d. failing to review Mr. Mobley's medical and mental health history before or after providing him with medications;

    e. failing to investigate the basis for Detention Defendants locking Mr. Mobley in solitary confinement or segregation;

    f. failing to refer him for a mental health evaluation and treatment by a psychiatric provider;

g.  failing to provide medications for Mr. Mobley within an hour of 10:00 and 22:00, in violation of MCSO Policy and Procedure;

h.  failing to recognize risperidone was a high priority medication;

i.  failing to notify the respective prescriber each time Mr. Mobley refused (missed) risperidone dosage, in violation of MCSO Policy and Procedure;

j.  failing to respond to and intervene on missed prescription medication;

k.  failing to address Mr. Mobley's pattern of alleged prescription medication refusals, in violation of MCSO Policy and Procedure;

l.  otherwise neglecting Mr. Mobley and failing to treat his mental health and medical conditions; and

m.  in such further ways as may be shown by the evidence.

580.    Josephine Bashaka, MA, Tadashia Brice, MA, Christi Eden, MA, Shavonne Ellis, MA, Valerie Gilbert, LPN, Gilda Louallen, MA,  Brittany Moore, LPN, Judith Mortel, LPN, Tiana Motley, LPN, Tiarra Slade, LPN, Shanta Smith, MA, Aaliyyah Green, MA, Dollie Wasson, LPN, and Dwayne Williamson, LPN were grossly negligent in their care of Mr. Mobley because their actions:

a.  lacked even slight care;

b.  showed indifference to the rights and welfare of his person;

c.  were of an aggravated character;

d.  were committed in reckless disregard for the rights and safety of Mr. Mobley;

e.  intentionally failed to comply with their duties as a certified or licensed healthcare professional; and

f.  in such further ways as may be shown by the evidence.

581. The Medical Defendants were employed by Wellpath, LLC and/or Reserve Health and acting within the course and scope of their employment when they provided medical care to Mr. Mobley at MCDCC.

582. Reserve Health is vicariously liable to Plaintiff, pursuant to the doctrine of *Respondeat Superior*, for the medical malpractice by any of the Medical Defendants it employed.

## FIFTH CLAIM FOR RELIEF
### (Corporate Negligence and Gross Negligence by Defendant Reserve Health)

583. Plaintiff incorporates the paragraphs above as if fully set forth herein.

584. At all times relevant to this action, Reserve Health had a duty to use reasonable care in performing its corporate policy, management, and/or administrative functions and decisions at MCDCC.

585. At all times relevant to this action, Reserve Health was aware that it needed adequate policies and training for medical staff at MCDCC on emergency medical care and medical monitoring for residents with severe mental health disorders and drug or alcohol intoxication.

586. In addition, Reserve Health was aware that the Medical Defendants were not fit to provide all of the mental health and medical care at MCDCC to a resident with serious medical needs, like Mr. Mobley, because they lacked the necessary skills, training, and experience, and were inadequately supervised by Dr. Biondi or another physician.

587. Reserve Health was negligent and breached its duty of care to Mr.

Mobley by:

    a.  failing to institute an adequate policy for emergency medical care for MCDCC residents suffering from severe drug or alcohol intoxication;

    b.  failing to institute an adequate policy on medical and mental health care for residents suffering from severe mental health disorders;

    c.  failing to provide proper training for the nursing staff on medical monitoring for residents suffering from severe mental health disorders;

    d.  allowing the mental health care for MCDCC residents suffering severe mental health disorders with serious mental health needs to be exclusively provided by physician assistants, nurse practitioners, or social workers, without any regular onsite oversight from a licensed physician;

    e.  failing to employ an onsite psychiatrist to evaluate, treat and monitor MCDCC residents suffering from severe mental health disorders;

    f.  failing to provide psychiatrist-based care via telehealth more than five hours per week;

    g.  failing to institute a policy requiring in-person examination by a psychiatrist for MCDCC residents presenting with severe mental health symptoms or other related serious medical needs;

    h.  failing to properly monitor, audit and supervise the performance of the Medical Defendants;

    i.  failing to institute proper policies, staffing and/or supervision at MCDCC to ensure adequate health care for residents suffering from severe mental health disorders with serious medical needs, including conditions and emergencies such as schizophrenic relapse, severe intoxication and drug overdose; and

    j.  in such further ways as may be shown by the evidence.

588.    Reserve Health was grossly negligent in performing its corporate administrative duties due to its willful or wanton conduct.

589.    Reserve Health failed to carry out its duties imposed by law or contract

which were necessary to protect the safety of residents at MCDCC and acted with conscious and intentional disregard for the rights and safety of others, including Renny Mobley.

590.  Reserve Health is liable to Plaintiff for corporate and administrative negligence that caused Mr. Mobley's personal injuries and wrongful death at MCDCC.

## DAMAGES

591.  As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence and gross negligence, Mr. Mobley died on March 27, 2024.

592.  As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence and gross negligence, Renny Mobley suffered severe personal injuries during his pre-trial detention at MCDCC from the deterioration of his health, including schizoaffective relapse, drug overdose, respiratory failure, and cardiac arrest.

593.  Due to Mr. Mobley's personal injuries, he experienced physical pain, mental suffering and mental anguish.

594.  Mr. Mobley also experienced disability, and hardship from the loss of use of his body and mind due to his physical injuries and the deterioration of his medical condition.

595.  Plaintiff, as the Administrator of the Estate of Renny Mobley, is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr.

Mobley's personal injuries under N.C. Gen. Stat. § 28A-18-1.

596. Mr. Mobley would be alive if Defendants had obtained appropriate medical attention and treatment for his serious medical needs.

597. Mr. Mobley was 43 years old at the time of his death.

598. Mr. Mobley is survived by his daughter, Jade Aunea Mobley, who is his sole heir under the North Carolina Intestate Succession Act, N.C. Gen. Stat. § 29-1, *et seq.*

599. As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence and gross negligence, Plaintiff, as the Administrator of the Estate of Renny Mobley, is entitled to recover the following damages under N.C. Gen. Stat. § 28A-18-2(b):

    a. Compensation for the pain and suffering of Mr. Mobley;

    b. The reasonable funeral expenses of Mr. Mobley; and

    c. The present monetary value of Mr. Mobley to his daughter of the reasonably expected:

        i. Services, protection, care, and assistance of Mr. Mobley, whether voluntary or obligatory, to his daughter; and

        ii. Society, companionship, comfort, guidance, kindly offices, and advice of Mr. Mobley to his daughter.

600. Plaintiff, as the Administrator of the Estate of Renny Mobley, is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr. Mobley's wrongful death under N.C. Gen. Stat. § 28A-18-2.

601. The acts of deliberate indifference to Mr. Mobley's serious medical needs by Detention Defendants D.O. Chea, D.O. Garris, D.O. Jaquez, D.O. Lewis, D.O.

Massey, Sgt. Blocker, Sgt. Caver, Sgt. Langford, Sgt. Martinez, Sgt. Neece, Capt. Buchanan, Capt. Payne, Capt. Houpe, Chief White and Medical Defendants Atabong, Bashaka, Brice, Eden, Ellis, Fair, Gilbert, Le-Bliss, Louallen, Mercado, Moore, Mortel, Motley, Noltemeyer, Sanchez, Slade, Smith, Squibb, Terry Green, Thompson, Wasson, Williams and Williamson, and Defendants Doe 1 through Doe 8 were done with reckless or callous indifference to Mr. Mobley's civil rights, Plaintiff is entitled to recover punitive damages from these Defendants under 42 U.S.C. § 1983.

602.    The policies and customs of deliberate indifference to the serious medical needs of MCDCC residents suffering from severe mental health disorders and severe drug intoxication, like Mr. Mobley, by Mecklenburg County, Reserve Health, Sheriff McFadden and Dr. Biondi were done with reckless or callous indifference to MCDCC residents' civil rights. Plaintiff is entitled to recover punitive damages from these Defendants under 42 U.S.C. § 1983

603.    The acts of medical malpractice by the Medical Defendants as alleged above, were done with conscious and intentional disregard of and indifference to the rights and safety of others, including Mr. Mobley, which each of them knew or should have known was reasonably likely to result in injury, damage or other harm, including death.

604.    The medical malpractice committed by the Medical Defendants was willful or wanton conduct as defined in N.C. Gen. Stat. § 1D-5.

605.    The acts of corporate negligence and gross negligence by Reserve Health, as alleged above, were committed with conscious and intentional disregard

of and indifference to the rights and safety of others, including Mr. Mobley, which Reserve Health knew or should have known was reasonably likely to result in injury, damage or other harm, including death.

606. Upon information and belief, Reserve Health intentionally provided inadequate staffing, monitoring, and supervision at MCDCC which placed residents at risk of serious injury or death in order to maximize and increase profits.

607. The corporate negligence and gross negligence committed by Reserve Health was willful or wanton conduct as defined in N.C. Gen. Stat. § 1D-5.

608. Dr. Biondi, an officer, manager and owner of Reserve Health, participated in and/or condoned the willful or wanton conduct by Reserve Health.

609. Plaintiff is entitled to recover punitive damages from Medical Defendants and Dr. Biondi under N.C. Gen. Stat. § 1D-5.

610. Plaintiff is also entitled to recover reasonable attorneys' fees and litigation expenses from Defendants (excluding Ohio Casualty) pursuant to 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court for the following relief:

1. Compensatory damages from all Defendants, jointly and severally, for Mr. Mobley's personal injuries and wrongful death;

2. Punitive damages from the Medical Defendants, Detention Defendants, Dr. Biondi and Reserve Health under 42 U.S.C. § 1983;

3. Punitive damages from the Medical Defendants and Reserve Health

under N.C. Gen. Stat. § 1D-15.

4. Reasonable attorneys' fees and litigation expenses from Defendants (excluding Ohio Casualty) pursuant to 42 U.S.C. § 1988;

5. Costs of court and interest as allowed by law;

6. A trial by jury on all disputed issues of fact; and

7. Such other and further relief as the Court may deem just and proper.

This the 5th day of February, 2026.

/s/ Amanda A. Mingo
Amanda A. Mingo, NC State Bar # 24423
/s/ Katie C. Clary
Katie Clary, NC State Bar # 39248
*Attorneys for Plaintiff*
Rawls, Scheer, Clary, & Mingo, PLLC
2333 Randolph Road, Suite 100
Charlotte, NC 28207
T: 704-376-2300
amingo@rscmlaw.com
kclary@rscmlaw.com